## Flaig v. The Andrews Steel Co.

(Decided December 16, 1910.)

### Appeal from Campbell Circuit Court.

Personal Injury—Hazardous Place to Work—Knowledge of Person Injured—Assumed Risk.—The rule appears to be well settled that where one accepts a hazardous employment knowing of the dangers with which it is surrounded, he is presumed to assume the risks ordinarily incident to that business. Applying this rule to the case at bar, appellant in accepting the employment and undertaking to discharge the duties assigned him at the place where

he was stationed near the pit, is in no condition to complain because the pit was not covered. It has uniformly been held that employes in accepting employment of this character assume the risks ordinarily incident thereto.

HORACE W. ROOT and B. F. GRAZIANA, for appellant.

FRANK V. BENTON, for appellee.

OPINION OF THE COURT BY JUDGE LASSING—Affirming.

Appellant, Charles Flaig, sued appellee company to recover damages for an injury sustained while in its employ as a laborer. Three grounds of negligence are set up in the petition—failure of the defendant to furnish plaintiff a reasonably safe place in which to work, failure to provide him reasonably safe tools with which to work, and failure to warn him of the dangers incident to his employment. The answer put in issue each allegation of negligence, and pleaded contributory negligence on the part of plaintiff. This plea was traversed in the reply.

Upon the trial but two witnesses testified as to how the injury occurred. These were plaintiff and one Charles McGraw, who was operating the machine where plaintiff was at work when injured. At the time of the injury plaintiff had been in the employ of the defendant company for eight days, doing such odd jobs as were assigned to him around the mill. At the date of his employment it was understood that as soon as an opportunity presented itself he was to work in the blacksmith shop, but up to the time of his injury no opening had occurred for him there.

On the morning of August 17th he was directed by the master mechanic to work at a small shear which was engaged in cutting short bars of steel, his business being that of an off-bearer of such bars. After having worked at this machine for something like two hours, he was told to work at another machine where thirty-foot bars were being cut; and it was after he had been working between an hour and a half and two hours at this machine that he sustained the injury complained of. The table on which the thirty foot bars were being run out extended from the shear over a pit, some eight feet wide, eighteen feet long, and about ten feet deep, near its center, so that the pit was open or exposed on each side of this table at a point near the shears. This pit was used as a dumping place for the hot bars as they were cut by the shears, it

being the practice of the company to have the hot bars dropped into a receptacle in this pit, and, when the receptacle was filled, a crane would be lowered and chains fastened to the receptacle and it would be lifted out of the pit and carried to other portions of the building and emptied. The crane was so adjusted that it could be lowered into the pit on either side of the table. Plaintiff's particular duty while at work at this table, was to see that the long bars, as they were run out under the shear, were kept straight on the table. In order to enable him to do this he was furnished with an iron rod, some four feet long, and bent at one end as indicated in the following figure:

O————————————————|

When the bar would bend outward he would hook his rod over it and pull it towards him, and when it would bend toward him he would put the end of the rod against the bar and push it from him. If, for any reason, the bar failed to come through far enough under the shear, he together with other employees would, by the use of a grab hook, pull the bar through the desired length; and if it came through too far, so as to bring the end beyond the shear or knife which was to cut it off, it was his duty to hook his rod over the end of the bar and pull it back, while another employee raised the other end slightly so as to enable it to pass under the shear. The table upon which these bars were being run out was at about an elevation of four inches below the shears. Four bars would run through at one time, each bar being about 8⅛th inches in width and 2-5ths of an inch thick. Several such layers would be run through and cut before they were removed.

After plaintiff had been thus engaged for something like an hour and a half, a bar passed too far under the shear, and the man who was engaged in operating the shear called to plaintiff to pull it back. He hooked his rod over the end of the bar and pulled in the proper direction. The hook slipped off of the end of the bar, he lost his balance and fell into the pit and was seriously injured in his legs and feet.

It is the theory of the plaintiff that his rod was caused to slip from the bar of steel by the elevation of the end of the bar next to the shear, although it is not clearly shown that at the time of the accident, the end of the bar next to the shear had been elevated at all. It was shown

that if it was elevated it was not elevated more than 2½ inches at the most, and the evidence shows beyond contradiction that the elevation of a bar of hot steel twenty-three feet long (which was the length of the bar upon which he was pulling), at one end will have no appreciable effect upon the bar at the other end, for the reason that the elasticity of a bar of this character and thickness is such that it would not leave the table beyond a point four feet from the end which was being raised. Upon this showing it is contended by plaintiff that if the rod was not caused to slip from the bar by the elevation of the end thereof next to the shear, then it was because the raising of that end from one side caused the bar to shift at the other end toward the opposite side.

There is no proof, however, to support this theory, for it is not shown that the end of the bar against which plaintiff was pulling did shift in the slightest. All that the proof does show is that he took hold of this end of the bar with his hook, that he pulled, and it slipped therefrom. The place where plaintiff was engaged at work was within 3 1-2 or 4 feet of the pit into which he fell. Just what caused the hook to slip from the end of the bar is not shown. Whether it was due to the fact that the end of the bar was round, so that the hook would not take hold readily, or whether plaintiff threw his weight against the rod before he had secured a firm hold on the end of the bar, or whether it was caused by the movement of its other end by his helper or co-worker, is a matter of speculation. Neither plaintiff nor McGraw were able to say whether the end of the bar next to the shear had been raised or not. But conceding that it had, this could scarcely have caused the hook to slip from the other end of it, for it was shown by actual demonstration with a cold bar of this length, which is less elastic than a hot bar that the elevation of one end as much as 4 1-2 inches has no appreciable effect whatever upon the other end. Neither could the prying up of one end of the bar have caused the far end thereof to move laterally, for it was in between other bars on the table and could not have moved as much as an inch either way.

The proof shows that the rod with the hook on the end of it was a suitable tool for the business and the kind in general use at the mill for the purposes for which it was employed. It was not shown to be defective in any particular, although plaintiff testified that he believed that, from his experience with tools around blacksmith shops,

etc., a tool better suited for the work could have been made. He made no objection to the use of this tool, nor did he testify at the trial that it was not a suitable tool for the work which he was required to do with it; but simply that he believed a tool better suited for the work could be made.

At the time of the injury plaintiff was about forty-nine years of age, and had worked many years around rolling mills and blacksmith shops. He had been engaged in this plant for eight days. He knew of the presence of the pit; knew that the table at which he was working extended across the pit; knew and understood the purposes for which it was used; and knew that if he fell into it he was liable to be hurt. The employment given him was in itself neither difficult, complicated nor hazardous, and to one of his age and experience in the mill and blacksmith business and in the use of tools and handling of iron, was not such as needed or required explanation or warning; for he testifies that he understood fully that if he fell into the pit he would be injured. He could not have fallen into it but for the fact that he lost his balance. The injury occurred in broad daylight, at a place where there was nothing to obstruct his view.

On this showing the trial court peremptorily instructed the jury to find for the defendant, which was done, and of that ruling plaintiff complains and prosecutes this appeal.

Before entering upon a consideration of the main question, we will dispose of appellant's complaint that the trial court abused its discretion to his prejudice in not permitting him to ask of his witness, Charles Mc-Graw, leading questions. This complaint is based upon the theory that McGraw was a hostile witness, and therefore he should have been permitted to have asked leading questions in order to properly present his case. The facts disclosed by the record are, that this witness had been subpoenaed by each side, and that he had, at the time he was testifying, given up his position with the appellee company and was about to leave the State to accept employment in a steel plant at Columbus, Ohio, where he had formerly worked. It appears that he and appellant were entirely friendly, and that he had voluntarily gone with appellant to the office of appellant's counsel for the purpose of assisting appellant in the preparation of his case for trial. There is nothing in the rec-

ord to show that he was hostile to appellant or his case; and, in the absence of such showing, the trial court was justified in ruling as it did.

Nor is appellant afforded any substantial ground for relief because the jury was taken by the court into the court house yard to view some steel bars placed there by appellant company for the purpose of being used as exhibits in the case. On account of their length and weight it was found impracticable to take them to the court room, and they were therefore placed in the court house yard, and the court permitted the jury, accompanied by the counsel representing the litigants, to go to the yard and view these bars. We are unable to see wherein appellant could possibly have been prejudiced by this act any more than he would have been had the bars been brought into the court room and used as exhibits there in the trial of the case. It is not complained that either appellee or his counsel. or anyone else, was, during the time the jury was in the court house yard viewing these exhibits, guilty of any improper conduct, or did anything in any wise calculated to prejudice appellant's rights. This being so, appellant is offered no just ground of complaint because the trial court permitted these exhibits to be examined in the court house yard rather than brought into the court room itself.

Appellant's counsel lays but little stress upon the allegation that he was not furnished reasonably safe tools with which to work. In view of the testimony of appellant, he could not well do otherwise, for appellant did not testify that the hook with which he was working was defective or unsuitable for the work which he was required to do with it On the contrary, it appears from the evidence that it was a suitable hook, not in the judgment of appellant, perhaps, the best that could have been provided, but nevertheless reasonably suitable for the business. And in the absence of a showing on his part that the hook was either defective or unsuitable for the work, he is afforded no basis or ground for complaint because it was not the best or safest tool that could have been constructed for doing that work. All that is required of a master is that he shall furnish his employee reasonably safe and suitable tools with which to work.   Derby's Admr. v. K. C. R. R. Co., 9 Rep., 153; 26 Cyc., 1107.

We will next consider the question as to whether or not appellee was negligent in failing to instruct appellant or warn him of the dangers incident to his employ-

ment. If there had been anything difficult or intricate in the use of the rod or hook with which appellant was required to work, there might be some foundation for his charge that the injury resulted from the failure on the part of appellee to instruct him in its use. But it is so simple in its mechanism and its uses were so easily understood, that it would be difficult to perceive how one of appellant's age and experience with the use of tools could have failed to know and understand all about it. And "where the mode of operating it (an implement) is so simple that a person of ordinary intelligence or care can at once perceive the safe and proper mode of operating it, there is no duty resting upon the master to instruct him." Jones v. L. & N. Ry. Co., 95 Ky., 576. Thompson on Negligence, vol. 4, sec. 4074, thus admirably states the rule:

"The master may be allowed to presume, in the absence or knowledge or some warning to the contrary, that an adult servant has sufficient knowledge to operate simple tools and devices, and to conduct and participate in simple operations without special warning or instruction."

It will be readily seen that there really was nothing in which appellee could have instructed appellant that he did not already know. His years of experience in the use of tools around blacksmith shops, his connection with rolling mills in the capacity of laborer or blacksmith, and his general use of tools as a mechanic, surely fitted him to understand the uses of the rod with which he was required to work. He was likewise familiar with the danger of injury that would result to him if he fell into the pit. His injury was simply the result of an accident, due to no fault on the part of appellee to instruct him or to furnish him with tools reasonably safe and suitable for the work in which he was engaged.

If any liability attaches whatever, it is for a failure on the part of the master to cover up or guard the pit while the long bars were being cut. This pit was in constant use whenever the shears were being operated. Into it all the small bars and ends cut from the longer ones were dropped, and when the receptacles into which they were thrown were filled, they were lifted from the pit upon either side by means of a crane and carried away to other parts of the building. To have surrounded it with a guard rail or covered it up would have been to practically destroy its use. The small bars did not of them-

selves fall into the pit, but were thrown therein. The evident purpose, in throwing them into the pit, was to keep the employees in the mill from coming in contact with the hot iron upon the floor. For this reason it became necessary to have some place where this hot iron could be put away from the possibility of contact and out of the reach of employees. Since the bars had to be thrown into the receptacle in the pit, it was necessary that it should remain open whenever these bars were being cut. Hence a railing around it would have seriously interferred with 'if it had not entirely destroyed, its use; and to have covered and uncovered it as each billet or bar was thrown into the receptacle therein would have for all practical purposes denied to appellee the right to its use. From the evidence it is quite clear that it was necessary, in the practical operation of the mill, that this pit should remain open.

Appellant knew and understood that the pit was open and uncovered, and knew that it was only three and a half or four feet from the point where he was standing to its edge. He likewise knew that if he fell into it he was liable to be injured; and with this knowledge, without complaint, he set about to do the work assigned to him.

A question very like that under consideration was before this court in the case of Williams v. Louisville & Nashville R. R. Co., 111 Ky., 824, where, in passing upon the right of an employee to recover for injuries resulting to him from a fall into an ash pit, said:

"An ash pit is a necessary adjunct of the railroad business in cleaning out engines employed by the company, and it is necessarily used at all hours of the day and night; and persons employed by the railroad company in such yards are bound to take notice of the existence, location, condition, and manner of use of such ash pits, and assume all the risks ordinarily incident to such location."

Again, in the case of Wallace v. South Covington & Cincinnati Street Ry. Co., 118 S. W. 962, where a recovery was sought for an injury resulting from an employee falling into a pit, this court said:

"It was necessary to have a pit in the barn, so the workmen could get under the cars. The plaintiff was well aware of its existence, and his falling into it was due to no negligence on the part of the defendant. He knew it was not guarded, and cannot complain that there were no guards to protect him from falling into it. He knew

he would fall into it if he walked close to it and lost his balance.''

In each of these cases from which we have quoted, an employee fell into a pit at a time when it was not in use and was left open and unguarded. If no recovery could be had against an employer who left a pit of this character open and unguarded when not in use, surely a stronger reason is presented why no recovery should be had by one who, through mishap, fell into the pit when it was being used and open for that very purpose. As was well said in the case of Harper v. Illinois Central R. R. Co., 115 S. W., 198.

''The master is not an insurer. Every employee in every business must assume some of the risks and danger that are incident to it, or that may happen even with the utmost care on the part of the employer to prevent or guard against them. Liability ought not to be fastened on the master for every injury that his servants may receive.''

And in the case of Wilson v. Chess & Wymond Co., 117 Ky., 567:

''The duty of the master to furnish a safe, or reasonably safe place in which the laborer may do his work is frequently either misunderstood or misapplied. In the first place, the master is not required to furnish an absolutely safe place. If the work is in and of itself dangerous, the master does not insure against such dangers. On the contrary, there is nothing better settled than that the servant assumes the ordinary risks and hazards incident to the character of his work.''

Thus the rule appears to be well settled, that where one accepts a hazardous employment, knowing of the dangers with which it is surrounded, he is presumed to assume the risks ordinarily incident to that business. Applying this rule to the case at bar, appellant, in accepting the employment and undertaking to discharge the duties assigned him at the place where he was stationed near the pit, is in no condition to complain because the pit was not covered. Had he been walking along near it and lost his balance as he did when the hook slipped from the end of the bar of iron, he would have perhaps fallen into it just the same; and if the accident had happened in that manner it would have been identical in every particular with that in the cases of Williams v. L. & N. R. R. Co., and Wallace v. South Covington & Cincinnati Street Ry. Co., to which reference has been made.

A railroad brakeman, working upon the top of box cars, is engaged in a most hazardous undertaking, for if at any time while the train is standing or in motion he should lose his balance and fall from the car, he would likely meet with serious injury. And yet, unless it could be charged that he was caused to lose his balance by some act of those in charge of the train which amounted to negligence, the company would be in no wise answerable for his injury. It can scarcely be contended that it is the duty of railroads to have railings placed upon the tops of their box cars to guard against accidents of this character. No court has so held; and yet the books are full of cases growing out of accidents to employees caused by their falling from cars in the manner above described. It has uniformly been held that employes, accepting employment of this character, assume the risks ordinarily incident thereto.

So, a man engaged in gathering ice from a running stream. If he is furnished with tools such as are reasonably suitable for cutting and pulling the ice from the water, and undertakes the employment, knowing the dangers with which the business is attended, and, in attempting to pull a cake of ice from the water, loses his balance and falls into the water or upon the ice, and suffers an injury thereby, the master will not be liable, for this is but one of the risks incident to the business.

Instances might be cited almost without number illustrating the principle, that the successful prosecution of almost every business is attended with more or less of danger and hazard. And while courts have uniformly held that it is the duty of the master to furnish the servant a reasonably safe place in which to work, they have likewise held that, where a servant accepts employment in a hazardous undertaking, knowing of the dangers, he is presumed to have assumed the risk ordinarily incident thereto, and, if injury results, no recovery can be had.

Judgement affirmed.

Whole Court sitting.

Dissenting opinion by Judge NUNN in which Judge CARROLL concurs.

Mills of this character are dangerous, and to make them reasonably safe, so that men can work in them with as little danger as possible, it was necessary to put up a railing on the side next where he was pushing or pulling the bars or sheets. This railing could have been placed

as stated without rendering the pit less useful to the company.