# Louisville & Nashville Railroad Company v. Adams, By, et al.

# Adams, By, et al. v. Louisville & Nashville Railroad Company.

(Decided May 23, 1912.)

## Appeals from Fleming Circuit Court.

1. Pleading—Prayer of Petition.—Where a petition contains two or more paragraphs, each seeking the same character of relief, it is not necessary that there should be a separate prayer in each paragraph as one prayer for the relief sought at the conclusion of the last paragraph will be sufficient. But if the character of relief sought in each paragraph was different, there would be much reason for requiring the plaintiff to specify in each paragraph the kind of relief sought.

2. Pleading—Separate Paragraphs, How Pleaded.—Where a pleading contains more than one paragraph, each paragraph should be sufficient in itself, or, in other words, state a good cause of action without reference to the other paragraphs.

3. Pleading—Joinder of Causes of Action.—A plaintiff may in one petition seek a recovery in damages for two separate distinct acts of negligence committed by the same defendant, and have relief on the cause of action set up in each paragraph in the same trial and in a single recovery.

4. Pleading—Amending Petition During Trial.—During the trial and pending a motion for a peremptory instruction, the plaintiff may with the permission of the court amend his petition and unless it appears that in allowing the amendment to be filed the court abused a sound discretion, the ruling will not be interfered with.

5. Master and Servant—Duty to Youthful or Inexperienced Servant. —Where a master who is present orders a young or inexperienced servant into a place of great danger, or without ordering him sees him take a place of great danger without warning him of the peril, the servant will not be held to have assumed the risk, although the danger may be obvious, unless it appears that the servant knew and realized the danger and with this knowledge and realization voluntarily assumed it; and, where there is conflict in the evidence upon this point, it is for the jury to say whether or not the servant assumed the risk.

6. Master and Servant—Assumes Risk.—When the master is not present and the servant acts on his own judgment, and the danger is so obvious that no prudent person would take the chance of injury attending the work, the master will not ordinarily be liable, as the servant will be held to have assumed the risk, if the master was not negligent in furnishing defective appliances or in failing to keep the premises in repair.

7.  Master and Servant—Damages, Not Excessive.—Where a boy
    seventeen years old was seriously and permanently crippled, a
    verdict in his behalf for $6,000.00 was not excessive.

O. R. BRIGHT, BENJAMIN D. WARFIELD for Railroad Company.

C. B. MORFORD, B. S. GRANNIS for Adams.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming
each case.

These two appeals have been prosecuted on the same
record and will be disposed of together.

E. V. Adams, a boy about seventeen years old, while
in the employ of the Louisville & Nashville Railroad
Company in April, 1910, sustained injuries by falling
from a high trestle; and, in December, 1910, while yet in
the employ of the same company, he sustained further
injuries by falling from a bridge. To recover damages
for the injuries sustained in both of these accidents, he
brought suit against the railroad company.

His petition contained two paragraphs. In the first
paragraph he sought damages for the injuries sustained
in April, 1910, setting up in substance that while he was
engaged working in a safe place on a high trestle, he
was hurriedly called by his foreman to go to another
place and assist some men who were making an effort
to change the position of a long and heavy piece of tim-
ber. That the timber which he was called to assist in
moving was lying on the side of the trestle on a plank
walk-way between the railroad track and the edge of the
trestle, and about seven inches from the edge. That
along the edge of the trestle there was a single railing,
something over three feet high from the plank floor of
the trestle, which railing was supported by posts about
ten feet apart. That when in obedience to the command
of his foreman to come he reached the timber, the fore-
man directed him to jump over the outside of the timber
and on the seven-inch space between it and the edge of
the trestle, and, while in this position and in the act of
assisting to lift the timber, his feet or hands slipped and
he was precipitated to the ground below, a distance of
nearly 35 feet.

In an amended petition, filed during the progress of
the trial, he averred in substance that the foreman was
guilty of gross negligence in ordering him to take this
dangerous position, the danger of which was fully

known or by the exercise of reasonable care could have been known to the foreman, and was not known to or realized by him and could not have been known to him under the circumstances by the exercise of ordinary care. That he was inexperienced in such work, and hurriedly called to help in an emergency, without previous notice of what he was to do, and ordered into a dangerous place without time to study the situation.

In the second paragraph of the petition, in which he sought to recover damages for the injuries sustained in December, he charged in substance that while working on a bridge, he was directed by the foreman to hold a large iron pin, weighing about 80 pounds, while the same was being driven out of its place in the bridge by another employe, and, that while in a stooping position holding the pin as it was being driven out, the pin was suddenly driven out of the hole by the blows of his coemploye, and the weight and momentum of the pin as it came out of the hole caused him to fall from the narrow place on the abutment on which he was standing, a distance of several feet, to the ice on the river below.

In an amended petition filed during the progress of the trial he further averred that it was gross negligence to order him to perform this dangerous work without explaining to him the danger which was fully known to the foreman in charge or could have been known by the exercise of ordinary care, and was not known to him and could not under the circumstances have been discovered by him.

Before taking up the merits of the case, we will notice two questions of practice that are raised. The petition, as stated, contained two paragraphs. The first one seeking a recovery on account of the trestle accident, and the second one seeking a recovery on account of the bridge accident. There is no prayer for relief of any kind in the first paragraph. This paragraph concluding with the words ''Plaintiff says that by reason of said injuries he sustained damages in the sum of $20,-000.'' The second paragraph, after averring that he sustained damages in the sum of $20,000, concludes with a prayer for judgment ''against the defendant for damages in the sum of $20,000, for his costs herein expended, and for all general and proper relief.''

On the trial of the case, at the conclusion of all the evidence, the trial judge sustained the motion of the railroad company for a peremptory instruction as to the

cause of action set out in the second paragraph of the petition, and, in obedience to this instruction, the jury on this ground of complaint returned a verdict for the defendant. As to the cause of action set out in the first paragraph of the petition, the court overruled the motion for a peremptory instruction, and the jury returned a verdict in favor of the plaintiff for $6,000.

From the judgment giving the peremptory Adams appeals, and from the judgment on the verdict the railroad company appeals.

It is now insisted, as it was in the lower court, that no judgment should have been entered upon this verdict, because the first paragraph of the petition upon which the case went to the jury did not contain a prayer for judgment in any sum. And, it is said that in the absence of a prayer for judgment, no judgment should have been entered on this paragraph. There is no doubt that under section 83 of the Civil Code, providing that:

"Several causes of action may be united, if each affect all the parties to the action, may be brought in the same county, and may be prosecuted by the same kind of action; and if all of them be brought  *    *    *    (6) for injuries to person and property."

The plaintiff had the right to state the two causes of action in two separate paragraphs, as he did, and to have relief on the cause of action set up in each paragraph, in the same trial and in a single recovery. But, when a pleading properly contains, as this one did, more than one paragraph, each paragraph should be sufficient in itself, or, in other words, state a good cause of action, without reference to the other paragraph. Black v. Holloway, 41 S. W., 576; Daily v. O'Brien, 96 S. W., 521.

As each of the paragraphs of the petition as amended did state a good cause of action, without reference to the other paragraph the particular point for decision is, was it indispensable that each paragraph of the petition should contain a prayer for relief, or, was a general prayer at the conclusion of the last paragraph for all the relief sought sufficient. Under section 90 of the Civil Code:

"The petition must state facts which constitute a cause of action in favor of the plaintiff against the defendant, and must demand the specific relief to which the plaintiff considers himself entitled; and may con-

tain a general prayer for any other relief to which the plaintiff may appear to be entitled." * * *

It is, therefore, necessary that every petition should contain a prayer for relief. But it would be very technical to rule that the plaintiff could not have the relief specifically prayed for at the conclusion of the last paragraph, when it appeared that he was entitled to this character of relief on the averments of the paragraph to which no prayer was attached. The prayer for relief really forms no part of the statement of the cause of action. It is merely a demand for the relief to which the pleader claims he is entitled on the statement of facts set out in the body of his pleading. If the cause of action stated in each paragraph was different, or the character of relief sought in each paragraph was different, there would be much reason for requiring the plaintiff to specify in each paragraph the kind or relief sought, so that the adverse party might be fully advised of the claim asserted against him. But, when, as in this case, the same kind of relief is sought in each paragraph, and the concluding paragraph contains in formal and correct phraseology a prayer for relief, we think this prayer should be treated as a prayer for relief under each paragraph. In Encyclopaedia of Pleading and Practice, volume 16, page 782, it is said, supported by authority, that:

"When a plaintiff's pleading contains several causes of action, it is not necessary to append a prayer for relief to each one, nor is it necessary or proper that each count in a complaint stating one cause of action should contain a prayer for relief."

In 31 Cyc., 112, it is said:

"Technical nicety is not required in the demand for damages under the codes and practice acts, and if it substantially informs defendant of the amount of the claim, it will be deemed sufficient. * * * A single prayer for relief at the end of a count is usually held sufficient for all the counts which precede it, if the language used is broad enough to include them. Where there is but one conclusion and damages to apply to more than one count, all of the counts are bad if the conclusion is bad. The amount demanded at the end of a declaration consisting of several counts should regularly be the aggregate of all the sums alleged to be due in the different counts."

Of course, in no state of case would the plaintiff be entitled to recover under any paragraph, or all of them put together, a larger sum than he asked for in the prayer of his petition.

Another question raised is that the court erred in permitting an amended petition to be filed at the conclusion of the evidence for the plaintiff and pending a motion that had been made by the defendant for a peremptory instruction. The petition in each paragraph was defective in form and substance, in failing to make some of the averments necessary to. state a good cause of action, and the amended petition merely supplied these defects in the petition. It did not set up any new cause of action, or in any manner change the cause of action attempted to be set out in the petition. The matter of filing amended pleadings during the trial is largely in the discretion of the trial judge, and this discretion we have uniformly declined to interfere with unless manifestly abused. Ford v. Providence Coal Co., 124 Ky., 517. And, it does not appear that in permitting this amendment to be filed the court committed error.

Coming now to the merits of the case and taking up first the injuries sustained by the fall from the trestle, on account of which the judgment complained of by the railroad company was rendered, the facts are substantially these: Adams had been working for the railroad company for more than a year as a water boy, and in this capacity had occasion to carry water about the trestle from which he fell. A week or so before the accident, he gave up his position as water boy, and was employed as an assistant or helper to a gang of men who were engaged in repairing or extending this trestle, which was used for the purpose of taking carloads of coal from the ground to a height of some thirty feet or more, at which point the coal was emptied from the cars into bins, and thence into the tenders of the engines. On this trestle there was a single railroad track, resting on ties the usual distance apart. On each side of the track there was a plank walk-way some three feet wide, and on the outer edge of these plank walk-ways there was a railing resting on posts something over three feet high from the plank walk. The space between the railing and the floor, except at the points where the posts stood, was open. A few days before the accident, the carpenters engaged in working on this trestle, assisted by Adams, had unloaded from a car the long and heavy piece of timber,

and placed it on the plank walk, parallel with the railroad track, and from four to seven inches from the outside edge of the walk. On the day of the accident, a crew of five carpenters in charge of Summers as foreman wished to move this timber from its position near the edge of the trestle, nearer to the rails of the track, so that they could better work on it. They made several efforts to move it, but on account of its size and the difficulty of using effectively the cant-hooks they had, it became necessary to have assistance. At this time, Adams in company with a co-laborer named Humphrey, was some 150 feet away, engaged in the comparatively safe labor of taking up plank from the trestle. While so engaged, it is agreed by everybody present that Adams and Humphrey were called to assist in turning over this timber. From this point on, there is material difference between the evidence of Adams and that of the foreman and other members of the crew as to what happened. Adams testifies that he was called by Summers, the foreman, who said: "Boys, come down here and help us; won't need you but about a minute." He further testifies as follows:

"Q. Who went? A. This fellow Humphrey and I. Q. Who got there first, you or him? A. I believe he was ahead of me. Q. When you got back there, what was the position of these hands? A. They were standing there by this piece of timber. Q. When you got up there, if you received any instructions, tell who gave them and what they were? A. Well, when we got within I guess, 20 feet of this timber, Mr. Summers said 'Jump over here, boys, and help us turn this over.' Q. Now, when Mr. Summers said 'Jump over here, boys, and help us turn this piece of timber over,' who got over there? A. This fellow Humphrey stepped over, and I stepped over after him. Q. Where was Mr. Summers at that time? A. He was standing across this rail or track. Q. On the opposite side of the track, facing towards you? A. Yes, sir. Q. About how far was he from you at the time you got into the position to turn this log over? A. About eight or nine feet, I guess. Q. Now, when you had gotten over there, what position did you take towards that log? A. I stepped over, turned kind of around, and stood facing the timber. Q. Then what did you do? A. They said 'lift.' and I lifted. I was stooping down in this position, with this hand on the tim-

ber; they never raised it, but I had never gotten my fingers under it, when they hollered 'lift;' I lifted all I could, and my feet slipped, and I went out under this railing. Q. How long had you been up there where that log was before you made the 'lift' on it? A. Well, we walked right up to it and stepped over, and reached down, and he said 'lift' and we lifted. Q. You were stooping down when the order to 'lift' was given? A. Yes, sir.''

On cross-examination, he was asked:

"Q. How long had you been working on that trestle? A. Come there the 15th of March, I think it was. Q. Stayed there until you fell in April? A. Yes, sir. Q. You were on and around that trestle all that time? A. Yes, sir. Q. Over all parts of it, that is, where you were working? A. I worked from the chutes on down; helped lay ties from the chutes down to the level of the ground. Q. You were familiar with the surroundings of that trestle, were you not, as to how it was constructed, what it was being used for, and what was being done with it? A. Yes, sir, I knew what it was used for and what we were going to do with it. Q. You walked over to where you say Mr. Summers called you? A. Yes, in about a half trot. Q. You were not in any special hurry, were you? A. No, running along at a pretty good gait.''

The evidence of Summers is in substance that the assistance of Adams and Humphrey was needed, and that some of the men called to them to come up and help, and they did so. That he did not call for them himself, nor did he say anything to Adams and Humphrey, or either of them, about getting on the side of the timber next to the edge of the trestle, or direct either of them where they should go, or give them any directions as to how they should work. That he did not notice the position Adams took when he came up, and did not know he was on the side of the timber next the trestle until he fell. He further said that Adams and Humphrey took the positions they did of their own accord, and without directions from any person. Summers' version of what happened is substantially corroborated by the other employes.

The essential points of difference between the evidence of Adams, and that of Summers and the other men, is that Adams says that Summers directed him to come up and help them, and that he came in a fast walk,

and that when he got to the timber Summers said "Jump over here, boys, and help us turn this over." While Summers and the other men say that no direction of this kind was given to Adams. Humphrey supports Summers' version of what took place, and says that he stepped on the outside of the timber next to the edge of the trestle for the purpose of lifting and took a position with his back to one of the posts on which the railing rested, so that he could not fall over, while Adams took a position between the posts where there was nothing to prevent him from falling if his hands or feet slipped.

Upon this evidence, it is insisted for the railroad company that its motion for a peremptory instruction should have been sustained—the argument in this behalf being that —Adams was an intelligent boy about 17 years of age, who had been working about this trestle in carrying water and laboring for a month or more, and was familiar with all parts of it. That the danger in taking the position he did was so plain that no person of ordinary intelligence could have failed to observe it, and that he took this place of his own volition without being directed so to do by the foreman or any one else and assumed the risk incident to it. It is further insisted that even if Summers told him, as Adams testified, to get on the side next the edge of the trestle, that the danger in so doing was so obvious that he should not have obeyed the order, and in no event is he entitled to recover for an accident caused by his reckless conduct in taking a position of open and imminent peril. On the other hand, the argument for Adams is that he was a boy, inexperienced in the kind of work he was called on by Summers to do, and that when Summers, the foreman, called to him to come up and help turn the timber over and directed him as soon as he reached the timber to jump over and help turn it over, that he did not have time or opportunity to realize or appreciate the danger of the position and had the right to obey the orders of his superior and to believe that he would not direct him into a position that must have been known to Summers to be imminently dangerous.

With the evidence and contentions of the parties as stated, the court gave these instructions:

"1. If the jury believe from the evidence that the place from which the plaintiff, E. V. Adams, fell when

engaged in or about to engage in assisting other hands of defendant to turn a heavy timber was an unsafe place for such undertaking on his part and more dangerous and hazardous to life and limb than the ordinary risks incidental to working as a hand in the construction and repair of railroad trestles, and that plaintiff took said position for the purpose aforesaid under the direction of defendant's foreman, Summers, and while so engaged the feet of said plaintiff accidentally slipped from the margin of the platform walk left between said timber and the outer edge of said platform, thereby causing him to fall therefrom, with resulting injury to himself, and the jury further believe from the evidence that the defendant was guilty of negligence by and through its agent and bridge foreman, Summers, in so directing plaintiff to the unsafe place aforesaid, if they believe from all the evidence said Summers did direct him, and that said plaintiff did not realize and under the facts and circumstances proven in this case had not reasonable opportunity to know and realize the hazard or danger to himself from going into the unsafe place from which he fell, then the jury will find damages for plaintiff; and unless the jury so believe, they will find for the defendant.

''2. Although the jury may believe from the evidence that plaintiff had no express order as to the particular place he should take to assist in turning the timber, yet if they further believe from the evidence that the place taken by the plaintiff was an unsafe place and more hazardous and dangerous to plaintiff than the ordinary and usual danger incidental to working as a hand in the repair or construction of railroad trestles, and that defendant's foreman so knew or by the exercise of ordinary care and diligence could have so known, then it was the duty of said foreman to warn plaintiff of his danger, and failing so to do if he knew or by the exercise of ordinary care and diligence could have known of the presence of plaintiff in said unsafe place in time to have averted the accident by so warning him, makes defendant company guilty of negligence within the meaning of instruction No. 1, the same as if the plaintiff had taken said unsafe place under the direction of said foreman.

''3. But the court instructs the jury that if the danger in taking the position which plaintiff took to assist in turning the timber in question was then and there real-

ized by him, or that he had reasonable opportunity under all the facts and circustances proven in the case to realize same, then the law is for the defendant, and the jury should so find, regardless of whether plaintiff was ordered into or voluntarily assumed the undertaking at the place from which he fell.

"4. The court instructs the jury that even though they may believe from the evidence that plaintiff was ordered by the defendant foreman to the place from which he fell, yet if they further believe from the evidence that the dangers of the place were plain and visible to a person of his experience and understanding under the circumstances in which he was situated, and that realizing said danger he without objection took said position and undertook to assist his fellow servants to turn the timber over, and in so doing his feet slipped from the walk-way, causing him to fall and be injured, then you should find for the defendant by reason of such contributory negligence on the part of plaintiff, and notwithstanding you may believe from the evidence that the defendant company was guilty of negligence."

It will be observed that by these instructions, to which serious objection is made by counsel for the railroad company, the jury were told to find for Adams if he was ordered to take the dangerous place by the foreman; or, if the foreman saw, or by the exercise of ordinary care could have seen him in this place of danger and failed to warn him; and, were directed to find for the railroad company if they believed that Adams realized or had reasonable opportunity under all the circumstances to realize the danger of the place, or if the danger of the place was obvious to a person of his understanding and experience and that realizing the danger he without objection took the position.

This court has had occasion in a number of cases to consider the liability of the master for injuries received by young or inexperienced servants, who were employed in places of great danger. In some of these cases the master has been held liable, and in others, not—the decision in each case resting upon its peculiar facts and circumstances.

Out of the many cases on this subject counsel for the railroad company rely on the following that are typical of the class they represent and in which it was held that the servant assumed the risk of the dangerous employ-

ment he was engaged in. Kelly v. Barber Asphalt Co.,
93 Ky., 363; Bollington v. L. & N. R. Co., 125 Ky., 186;
Wilson v. Chess & Wymond Co., 117 Ky., 567; L. & N.
R. Co. v. Boone, 138 Ky., 700; McCormick Harvester
Co. v. Lighter, 66 S. W., 761; Clifton v. C. & O. Ry. Co.,
102 S. W., 247; Avery & Sons v. Lung, 106 S. W., 865;
Flag v. Andrew Steel Co., 141 Ky., 391. While counsel
for Adams rely on Illinois Central R. Co. v. Keebler, 84
S. W., 1167; Runians v. Keller & Brady Co., 141 Ky.,
827; Ross-Paris Co. v. Brown, 121 Ky., 821; Louisville
Gelatine Co. v. Minton, 144 Ky., 834; City of Owensboro
v. Gabbert, 135 Ky., 346, that are fair examples of the
cases holding the master liable when the servant was in-
jured in a dangerous employment. The distinction be-
tween these classes lies in the fact that in one class the
master was present—and by the master, we mean his
representative in the form of a foreman or servant su-
perior in authority to the injured servant and with the
right to control him—directing the movements of the
servant, and in the other he was not present. When the
master is not present and when the servant acts on his
own judgment and the danger is so obvious that no pru-
dent person would take the chance of injury attending
the work, the master will not ordinarily be liable as the
servant will be held to have assumed the risk, if the mas-
ter was not negligent in furnishing defective appliances
or in failing to keep the premises in repair. But, when
the master is present directing the servant, the master
and not the servant assumes the risk of injury to a
young and inexperienced servant if he directs him into
the place or seeing him take it fails to warn him of the
danger, notwithstanding the fact that the danger attend-
ing the work is open and easy to discover.

There is no good reason why the master by indiffer-
ence or want of care should needlessly expose to danger
the persons in his employment. In almost every con-
structive work of any magnitude, the laborers are at
times placed in great peril by the conditions that are
made necessary in the progress of the work. But the
master is presumed to and generally does know the dan-
ger attending work of this character; and, when he has
engaged as a laborer a youthful or inexperienced ser-
vant, it is his duty not to needlessly expose him to dan-
ger or permit him to heedlessly put himself in a place of
unnecessary peril. When he is present superintending

and directing the work, the young or inexperienced servant has the right to believe that he will afford him such protection as the conditions of the situation allow and that he will not passively stand by and see him put his life in peril when there is no need for it.

Adams of course knew, so far as mere knowledge goes, that he was standing on a slender foothold, and that the least slip of hand or foot would likely result in his death or great injury. But in the hurry of the moment, acting in the presence of his foreman and under his orders, he did not stop to weigh the peril of the situation, or realize the danger, and is not under all the circumstances to be charged with having assumed the risk. The fact that the danger may be open and obvious will not always excuse the master. It must further appear that the young or inexperienced servant realized the danger before the master can defeat a recovery on the ground that the servant assumed the risk. Summers, the experienced foreman, was present, within a few feet of Adams and in full view of him, and could not avoid seeing him take the position that he did; and, seeing him take it, he must have known how extremely dangerous it was. So that, whether he ordered him to take the position, or saw him take it without warning, the liability is the same. In either event it was his duty to warn him of the danger. As said in City of Owensboro v. Gabbert, 135 Ky., 346:

"When the master is present, the doctrine of equal knowledge and assumed risk that is sometimes invoked in cases like this to relieve the master should be sparingly applied. The position of the two is very different, and out of this difference grows the right of the servant to depend upon the master if he be present directing the work as he has the right to presume he will warn him of danger and save him from needless exposure to injury or death."

We may, therefore, set it down as a rule of general application in cases of this kind that the master who orders a young or inexperienced servant into a place of great danger, or who when standing by sees a young or inexperienced servant put himself in a place of great danger, without giving him notice of the peril or the hazard he is about to take, will be liable, unless under all the facts and circumstances the servant knows and realizes the danger, and with this knowledge and realiza-

tion voluntarily assumes it; and, where there is conflict in the evidence upon this point, it is for the jury to say whether or not the servant assumed the risk. It may be said that this rule imposes upon the master the duty of guardianship, but if so, it will help to save many lives and limbs that are now recklessly and needlessly sacrificed by the indifference of masters and the heedlessness of servants.

The instructions presented very clearly our view of the law of this case, and although the weight of the evidence supports the contention of the railroad company, we are not prepared to say that the verdict is so flagrantly against the evidence as to authorize us to set it aside upon this ground.

It is also insisted that the verdict is excessive, but there is little ground for complaint upon this score. Adams was seriously and permanently injured by his fall, and narrowly escaped with his life.

The bridge accident may be disposed of in a few words. At the time he was injured Adams had been working on this bridge for several weeks. For a part of this time he was assisting in taking out pins that held the bridge girders in place. On the day of the accident, Adams and a fellow workman named Sowders had been on top of the bridge taking out the pins that held the girders, and after they finished this work they were directed by the foreman to help the men who were taking out these pins lower down on the bridge. When Adams fell from the bridge, he was standing on a pedestal on one side of a bridge girder holding a pin as it was being driven out of a hole by a workman with a sledge hammer on the other side of the girder. Before he undertook this particular employment, the bridge foreman warned him to be careful and not to fall; but, notwithstanding this warning, when the pin came out quite suddenly, the weight and momentum of it caused Adams in some way to lose his balance and fall to the ice on the river below. As Adams had been engaged in assisting to take out these pins for sometime before he fell, he was very familiar with the manner in which they were driven out, and in addition to this, was warned by the foreman to be careful and not fall. In view of these facts, it cannot be said that Adams did not understand and realize the danger of the employment he was engaged in. He could with this knowledge and with this warning, by the exercise of ordinary care have avoided falling. There was

nothing particularly complicated in the work he was doing, and while it was attended with some danger, it was not especially dangerous, and we think that under the circumstances he must be held to have assumed the risk which attended it.

The judgment on each appeal is affirmed.