## North Jellico Coal Company v. Stewart.

(Decided February 6, 1917.)

### Appeal from Knox Circuit Court.

1. **Appeal and Error—When Verdict Will be Set Aside.—**Under subsection 6, section 340, of the Civil Code of Practice, this court will set aside the verdict of a jury when it is flagrantly against the evidence, although it will not do so if the verdict is against the preponderance of the evidence.

2. **New Trial—Evidence.—**Plaintiff lost his limb from the effects of blood poison resulting from the appearance of a pimple or boil near his knee. The blood poisoning appeared about the 23rd of August, and his limb was amputated on September 1, following. After recovering from the operation he filed suit against his master, the North Jellico Coal Co., alleging that on the 13th of August he sustained an injury from the fall of some slate which was the result of negligence of the master. He said nothing about this injury until after his limb was amputated, claiming all the while that he had a pimple or boil on his limb, and even denied to his physician that he had sustained any injury. He failed to report the alleged falling of the slate to any of the officers of the mining company, nor did any of them learn of any such injury, neither

did the employers whose duty it was to remove the slate ever hear of any such injury or discover any fallen slate. The evidence of the physicians is to the effect that the blood poisoning could scarcely have developed from the injury which plaintiff describes, especially as late as it did in this instance. Held, that the verdict of the jury finding that the injury occurred, or that the blood poison was the result of it is each flagrantly against the evidence, and defendant is entitled to a new trial.

BLACK, BLACK & OWENS for appellant.

SAWYER A. SMITH and POWERS & SMITH for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

On September 1, 1914, the appellee (plaintiff below), who is a man 32 years of age, had his right leg amputated just above the knee, and some days thereafter it was again amputated about four inches below the hip, which last operation was successful, and the plaintiff was permitted to leave the hospital about October 10. He filed this suit against appellant (defendant below) seeking to recover from it the sum of $25,000.00 damages upon the ground that he was injured in his right leg while working as a miner in its coal mine about two o'clock p. m. on August 13, 1914.

Plaintiff's version of his injury (and he is the only witness who testified concerning it) is that he was at work as a coal digger in room number 6, entry number 2 of the defendant's mine near Wilton, Kentucky, which is located in Knox county; that he had been working in that mine for a number of years, and had been a coal miner for a still greater number of years, but had been working in that particular room since the preceding April. When he began to work in the room the face of the coal therein farthest from the entry was a distance of about 100 feet, and that he had worked back the face of the coal in that room about 75 feet, making the total distance at the time of the alleged injury about 175 feet from the entry. The opening leading from the entry into room number 6, where plaintiff was at work, is called a "room neck," and at the point where it left the entry going into room number 6 was between eight and ten feet wide and about four and one-half feet high. This "room neck" led into room number 6, which is about 70 feet wide, and about four and one-half feet from the top to the bottom. There was a track running out of room number 6 through the "room neck" to the

entry where it connected with another track leading out of the mine. Upon this track small cars were operated, and plaintiff, after shooting the coal, would load the cars and push them out of his room over the track and onto the one laid in the entry where they would be taken charge of by others and carried out of the mine. He says that upon the occasion complained of he was pushing one of the cars which he had loaded when just as his car was turning out of the "room neck" and into the entry (it being curved at that place) a piece of slate fell from the top of the "room neck" some few feet back from the edge of the entry and fell on the calf of his right leg and his knee was pressed against the floor or bottom, but that he immediately removed the slate to the side of the "room neck," put his coal car on the proper track in the entry and went back to his work, which he continued to perform for the rest of the day and for succeeding days up to and including the 20th of August. In his evidence he described the piece of slate as being about three feet long, two feet wide and upon the average of about an inch thick, but in telling his physician about the accident, after the amputation of his leg, he said the slate "was a very small piece, something like to his two fists, and big as a plate," which testimony of the physician is nowhere denied by the plaintiff. He lived some two or two and a half miles from the mine and he would travel this distance both morning and evening by walking. He says that when he got to his home that night he discovered that there was a small bruised place (no abrasion) on the back of the calf of his leg about half way between the knee and ankle; that he put some turpentine on this and it soon disappeared. A day or two after the supposed accident he discovered just below his right knee and a little to the left of the center "a small pimple," to which he applied turpentine and it within a short while disappeared. A day or two after this a pimple appeared about a half inch from where the first one was, which was likewise treated with turpentine, but it did not appear to yield to the treatment as did the first one, and finally developed into what the plaintiff describes as a small boil which in some way had its top or surface removed. By the 22d or 23d of August it pained the plaintiff to such an extent that his wife, over his protest, sent for a doctor. To use the physician's own language, he says:

"I found him in bed with something like a boil under the right knee cap, swollen up place like an ordinary boil with the top knocked off and around the sore was inflamed, and it was oozing out little yellow looking matter, and the whole knee inflamed from it, and I found the temperature 104 at that time." The physician says that he found no bruises of any character anywhere on plaintiff's leg, nor was he informed by the plaintiff of any accident calculated to produce the bruise. The treatment given by this physician was cauterizing the place, applying disinfectant and poulticing it with antiphlogistine.

Some days after this, another physician was called in, and the place, or some part of the limb nearby, was lanced, with the hope of arresting blood poison which had developed. This being unsuccessful, he was carried to the hospital, with the result hereinbefore stated.

Claiming that the defendant was negligent in failing to furnish him a safe place in which to work, and in failing to perform its duty to prop and maintain its mine so as to be reasonably safe, he filed this suit to recover for the loss of his limb, alleging that it was the proximate result of the injruies which he sustained.

The answer is a denial, and also contains a plea of contributory negligence and one of assumed risk. These were denied, and upon the issues thus made a jury upon the trial of the case returned a verdict in favor of the plaintiff for the sum of $5,000.00, upon which judgment was rendered, and to reverse which this appeal is prosecuted.

Numerous grounds are relied on for a new trial, and many errors are urged before us, some of which we are not at liberty to consider, because not presented in the motion for a new trial, and others are not before us because not included in the bill of exceptions or otherwise made a part of the record. Of the latter class are the errors as to the remarks of counsel for plaintiff in his closing argument to the jury, and the action of the court in limiting the argument to only fifteen minutes. Whatever we might think of these matters, 'they are not' open to discussion for the reason stated.

One of the grounds urged for a reversal is that the verdict is not sustained by sufficient evidence, and as we have concluded that this is well taken, we will confine what we have to say to that ground alone.

Three things are necessary for the plaintiff to establish to entitle him to a recovery. They are: (1) negligence on behalf of the defendant; (2) the happening of the accident resulting in the injury complained of; and, (3) that the injuries sustained are the proximate result of the accident.

Upon the first essential indicated, the testimony shows that there is a custom prevailing in defendant's mine requiring each miner to observe and to inspect the condition not only of the room in which he is at work, but the "room neck" where he has to do at least a part of his work, being that of getting the coal into the entry, and if he discovers any loose slate, to remove it, if within his power, but if not, to report it to the mine boss. However, by this csutom it is not intended to impose the exclusive duty of inspection upon the miner, for it is shown that there is a mine boss or inspector, and an assistant, whose duties are to inspect the condition of all parts of the mine where miners are at work. The proof shows conclusively, even by the testimony of the plaintiff, that one of these inspectors visited his room daily, and it is shown by the inspectors or bosses that they made daily inspections of the "room neck" to plaintiff's room, as well as his room, and that in no event did they allow more than one day to pass without such inspection. There is nothing to show that plaintiff at any time discovered or reported any loose slate to the mine boss or foreman, and so far as the evidence shows the piece of slate of which complaint is made is the first and only one that ever fell from the "room neck."

With the testimony in this condition, it is extremely doubtful if any negligence is laid at the door of defendant, but without determining it we will pass to the consideration of the second enumerated essential entitling plaintiff to recover.

It is admitted by the plaintiff that it was his duty if he discovered any loose slate or any fallen slate to make report of it so that in the first instance the dangerous condition might be remedied, and in the second instance so that fallen slate might be removed by those employed for that purpose, who, as we gather from the record, are known as "gin men." There is absolutely no testimony that any report of any character was made to any of the officers of the defendant of the occurrence

of which plaintiff complains. After the alleged injury he continued to work, and had conversations concerning the boil with a number of his associates at the mine, and in each instance he complained of nothing except that he had a boil, and stated to the witnesses at the time that he was subject to such eruptions, which he compared to that of poison oak. There were numerous conversations of this character before plaintiff ceased to work, and they continued with others who visited him at his house before he was taken to the hospital.

Three physicians waited upon plaintiff, two before he went to the hospital, and the one in charge of it. To none of these physicians did he disclose the fact of the accident, although they were anxious to find out a history of his case so that they might correctly diagnose it and thereby properly treat it. The evidence is positive that he told one of these physicians at least, when asked the direct question, that he had suffered no bruises of any character. The first time he ever made claim to having sustained the injury was after his limb was amputated and he was well on the way to recovery. The only explanation he gives for this most unnatural conduct and greatly suspicious silence is that his wife was nervous and he was afraid it would excite her. If it should be said that he was justified in concealing the fact of the accident at first because of the apparent slightness of the injury, this reason did not obtain when he was being interrogated about it by his physicians, and his excuse for not doing so then does not appeal to us as being sufficient.

It is shown by the physicians, whose testimony upon the point, as well as their reasons, are unnecessary to here relate, that the blood poison such as they found and treated could scarcely be produced from an injury such as the plaintiff describes and relies on in this case. This is the unanimous testimony of all the physicians who testified in the case, each of whom appear as a witness for the defendant (but not in its employ), the plaintiff contenting himself with relying upon his testimony alone, having closed his case when he finished testifying. This latter circumstance is not to be passed without notice, for if it be a fact that the blood poison resulting in the amputation of plaintiff's leg could be shown to have been the proximate result of the alleged injury, he most certainly could have found a physician by whom

he could have established that fact. Furthermore, if the slate had fallen as he describes, and which he says he placed in the side of the "room neck," there certainly could have been found some of the "gin men," or persons whose duty it was to remove it, by whom he could have shown that it was there. Coupled with these almost convincing circumstances refuting plaintiff's contention as to the occurrence complained of, we have the testimony of the physician stating that plaintiff denied any such occurrence, and which conversation is not denied by plaintiff anywhere in the record. He does say, however, that if he made any such statement he does not remember it.

It is furthermore shown that after the happening of the accident, as plaintiff describes, in the continuation of his work he would have to get upon his knees in order to bore into the face of the coal to create an opening for the blasting powder, by means of which the mining operation was done. It is shown by the testimony that the bottom of the mine at such place, being near the face of the coal, is more or less damp, and this would cause his pantaloons at the knees to become wet, and might create such conditions as would produce the pimples which he describes. None of the physicians found any evidences of any bruise, although they each made a thorough examination of the parts.

It is a rule of this court not to disturb verdicts of a jury returned under proper instructions unless they are flagrantly against the weight of the evidence. This rule prevails, although the verdict is against the preponderance of the evidence. L. & N. R. R. Co. v. Adams, 148 Ky. 513. But an issue of fact essential to the litigant's claim, when found by the jury contrary to the great weight of the evidence, and flagrantly against it, it is not only the right but the duty of this court to reverse such finding. The evidence which will entitle this court to so hold need not be direct testimony, but it has a right to look to and weigh the circumstances in determining the weight to be given to the testimony as a whole. Many times the circumstances may be of such a nature as to be more convincing than direct testimony itself.

Upon the crucial point as to the happening of the accident in this case, the direct testimony is that given by the plaintiff alone in support of his claim. If we were

to endeavor to weigh the testimony with the exactness of an apothecary's scale, we might say that his testimony on this point is fully offset by the statements which he made to his physicians, particularly to that one to whom he denied that he had sustained any bruises of any character.

When we look at the other circumstances which we have enumerated, and which we will not now repeat, the conclusion is almost irresistible that this supposed accident was thought of for the first time after the serious consequences developed. Whether so or not, we are convinced that if we are ever authorized to set aside the verdict of a jury as being flagrantly against the evidence, this case furnishes an illustration for the exercise of such authority. That we are so authorized under subsection 6 of section 340 of the Civil Code of Practice is abundantly established, as is shown by the following cases: I. C. R. Co. v. Long, 128 S. W. Rep. (Ky.) 890; same case, 146 Ky. 170; Continental Ins. Co. v. Hargrove, 131 Ky. 837; C. & O. R. R. Co. v. Johnson, 151 Ky. 809; C., N. O. & T. P. Ry. Co. v. Martin, 154 Ky. 378; Wickliffe Mfg. Co. v. Wilson, 169 Ky. 468. A rehearsal of the facts of each of those cases for the purpose of comparison with the facts of this case would render this opinion too long, and would be of no service to the parties or to the profession. It is sufficient to say that in at least some of them, if not all, the testimony in favor of the appellee was equally as strong as is that for the plaintiff in this case, and we then held that conditions were presented calling for the application of the matters set forth in subsection 6, *supra,* authorizing the granting of a new trial.

While we mentioned at the beginning of this subdivision of the opinion only the second essential enumerated herein, what we have said applies with equal force to the third one, inasmuch as it is almost conclusively shown by the testimony of the physicians who testified in the case that the blood poison resulting in the amputation of plaintiff's leg was not produced by the character of injury which he described, and the verdict of the jury upon this point we also find to be flagrantly against the evidence.

For the reasons indicated, the judgment is reversed, with directions to proceed in accordance with this opinion.