## Louisville & Nashville Railroad Company v. Baker's Administrator.

(Decided March 7, 1919.)

### Appeal from Rockcastle Circuit Court.

1. Trial—Peremptory Instruction.—A peremptory instruction is proper only after admitting every fact shown by the plaintiff's evidence to be true, as well as all reasonable inferences that can be drawn therefrom, plaintiff fails to establish his case.

2. Appeal and Error—Weight of the Evidence.—Whenever an examination of the record discloses the fact that the verdict is clearly and palpably against the weight of the evidence it is not only the right but the duty of the court to reverse and remand for a new trial.

3. Trial—Argument of Counsel.—Argument of counsel should be limited to matters within the record or to fair and reasonable deductions arising therefrom.

JOHN W. BROWN, C. C. WILLIAMS and BENJAMIN D. WARFIELD for appellant.

BETHURUM & LEWIS, W. T. SHORT, E. C. O'REAR and J. B. ADAMSON for appellee.

OPINION OF THE COURT BY JUDGE QUIN—Reversing.

Charles Baker, as administrator of Eugene Baker, instituted this action in the court below against defendant seeking damages for the death of his intestate, it being alleged in the petition that decedent was assaulted and ejected from a train near Ford, Ky., and thereby caused to lose his life. From a verdict in favor of the plaintiff this appeal is prosecuted.

The contention of the defendant is that a peremptory instruction should have been given in its behalf. It also complains of the instruction given and of counsel's argument to the jury.

The case is beset with some rather unusual circumstances. Decedent lived in Richmond, and it appears that in company with several companions he started in the direction of Winchester on the afternoon of December 22, 1914. According to the expression of some of the witnesses they were "hoboing;" i. e., they had taken passage on a freight train without paying therefor, in other words "beating their way." The time they left Richmond is uncertain. Three witnesses testified to having seen decedent get off a train at Shearer, a station north of Ford, and a like number saw him get on a train there northbound; five witnesses testified to having seen decedent in Winchester the evening of the accident; most of these had gone to Winchester for the purpose of getting whiskey; several of the witnesses testified they saw Baker at the depot that night waiting for a train to take him to Richmond or Berea, and two testified that they got on a southbound train at Winchester that night with the decedent and were in the smoking car of defendant's train. This train is known as No. 31. One of these witnesses, Grover Neal, testified that decedent had a little argument with defendant's conductor, but there was so much noise he could not tell what they were talking about. This argument took place along about Elkin, which is a station a short distance north of Ford, and after the argument started he left decedent and the conductor, going to another part of the car, and when he returned in ten or fifteen minutes afterwards he did not see the decedent, but he saw a hat "lying there" which looked like decedent's hat. David Himes, the other witness, testified as follows: "Q. How long did Eugene Baker stay on that train? A. Well, I couldn't say. Not

very long, though, I shouldn't think, or I didn't see him on the train. After we got up towards Ford, towards Ford there, there come up some trouble— Q. Some trouble between him and the conductor? A. Yes, sir. Q. Will you go ahead and tell the jury the nature of that trouble? A. We were all sitting there on the seat, talking and laughing and going on, and the conductor walked up and we were talking very loud, and the conductor walked up to Mr. Baker and told him he was going to put him off the train—was what he said—and they kind of got into a racket and I got up and walked out of the coach. Q. What was said between them? A. The conductor says, 'G— d— you, I am going to put you off of this train.' I believe that is the words he spoke. . . . Q. Tell the jury what position he was in with reference to Baker at the time he made the remark to him. A. He was standing right up in Baker's face when he made the remark. Q. What was Baker saying? A. Well, Baker was talking a little to him—wasn't talking very much, I don't think. Q. When that conversation was going on, what did you do? A. I got up and walked out of the coach and went into the ladies' car. Q. What made you do that? A. I seen there was going to come up some trouble, and I walked out and went in the other car. Q. Did anybody else go out? A. Lots of people went out. I couldn't state who all. Q. Anybody that you knew? A. No, not that I knew, I don't reckon, at all. Q. Did you go back into the car? A. Yes, sir. Q. After you got back there, tell the jury if anything happened to the train. A. Yes, sir, the train stopped a very few moments about Ford. They said it was about Ford. Q. Did you go back into the smoker after the train stopped? A. Yes, sir. Q. Where was Eugene Baker then? A. I never saw him any more at all. Q. You mean you never saw him after you left the car? A. No, sir. Q. Did you see anything that belonged to him? A. Yes, his hat lying in the floor. Q. Now, when the train stopped, did you see anything of him? A. No, I raised the window and looked out and they was dragging a man out from under the train; looked to me like a colored fellow, best I could tell about it."

On cross-examination witness testified as follows: "Q. And you say that he and the conductor got to talking and when they got to talking you went back into the other car? A. Yes, sir. Q. Had the conductor taken hold of him? A. Yes, sir, the conductor, I believe, had

hold of him. Q. You believe? A. Yes, sir. Q. Well, are you sure of that? A. Yes, sir. Q. In what manner did he have hold of him? A. Just walked up and took hold of him and called him that name. Called him what name? A. Said G— d— him, he was going to put him off the train. . . . Q. You went out into the ladies' coach; and what was Eugene Baker doing when you went in there? A. Standing up talking to the conductor. Q. He was standing talking to the conductor when you went out, was he? A. Yes, sir. Q. How long did you stay in the ladies' coach? A. Well, I stayed some little bit. Q. Well, how long? A. Until I thought the trouble was all over and I seen them dragging this man out from under the train, and I went back into the smoking car.''

This, in substance, is the testimony introduced on behalf of the plaintiff. For the defendant its conductor and flagman on the southbound train testified that decedent was not a passenger on their train; they had no difficulty of any kind, and that the events testified to by the witnesses Neal and Himes did not occur. ·

J. D. Johnson and his brother Oscar Johnson had gone to the station at Ford to meet their brother Jesse who was coming home for the holidays. They were walking along the track to keep their blood in circulation, and the younger of the two discovered something lying between the rails, and upon examination they found it was a man, and they dragged him off the track. This was before the arrival of No. 31. Seeing a light in the home of operator Johnson, they notified him, also Sheeler, the agent at Ford, and after reaching the latter's house they heard No. 31 whistle and hastened back to the station and got there just at the time the train arrived. They say it was 20 to 30 minutes from the time they first discovered this body until the train arrived and the body was there when they reached the station after notifying Johnson and Sheeler.

J. F. Johnson, the company's operator at Shearer, lived at Ford. He testified that shortly after he reached his home that night, and before the arrival of No. 31, J. D. Johnson and Oscar Johnson came to his house and told him ''they had found this man on the track—killed.'' He told them to notify Mr. Sheeler, and this it appears they did. Sheeler testifies that on that night, fifteen or twenty minutes before the arrival of No. 31, and after he retired, J. D. Johnson notified him there was a dead

body at the depot. Johnson reached the station shortly after No. 31 arrived; Sheeler got there just as No. 31 was fixing to leave.

E. K. Broaddus, a school teacher at Ford, and Dr. J. T. Pennington that same evening had been at a social gathering on the Madison county side of the river from Ford. They passed the station between eleven and eleven-thirty, and they saw this body from 15 to 20 minutes before the arrival of No. 31.

The flagman on the passenger train testified that when the train reached Ford he saw the body of a man on the platform; thus we have at least six witnesses who saw the body that was identified as that of Eugene Baker on the platform at Ford from 15 to 30 minutes before the arrival of No. 31, and four of these are disinterested witnesses, whose credibility and character are unimpeached, but as to the two witnesses for the plaintiff, who detailed the events on the train, their credibility is attacked. Hence, we have two states of facts that are irreconcilable. If decedent was in Winchester and became a passenger on train No. 31, then the witnesses for defendant could not have seen his dead body at Ford some time before the arrival of that train, or conversely stated, if the witnesses for the defendant are correct, then those who testified in behalf of plaintiff could not have seen him in Winchester at the time stated nor could he have taken passage on No. 31.

Counsel for the defendant, with great vigor and earnestness, insist there was no evidence to take the case to the jury. It is a close case on the facts. We understand the rule to be that where there is any evidence for the plaintiff, or any fact shown from which the inference may be plainly drawn that the accident occurred as testified to by witnesses in his behalf, the question is one for the jury, although the evidence for the defendant may be to the effect that the accident happened in an entirely different manner. To entitle defendant to a peremptory instruction the rule in this state is, that if, after admitting every fact shown by the plaintiff's evidence to be true as well as all reasonable inferences that can be drawn therefrom, the plaintiff failed to establish his case, a peremptory is proper. Two juries have found for the plaintiff in this case. The reason for the granting of a new trial after

the first verdict is not shown by the evidence, but under the scintilla rule we are not prepared to say that a peremptory in this case was proper.

Under sub-section 6 of section 340 of the Code, a new trial is authorized when the verdict or decision is not sustained by sufficient evidence. Under this section the court will not set aside a verdict merely because it is against the preponderance or weight of the evidence, nor because of the numerical superiority of witnesses. The verdict must be flagrantly against the weight of the evidence. But when such a state of case is presented it is not only the right but the duty of the court to reverse and remand for a new trial. Continental Ins. Co. of N. Y. v. Hargrove, 131 Ky. 837, 143 Ky. 400; Vincent, etc. v. Willis, 26 Rep. 842; C. & O. Ry. Co., et al. v. Johnson, 145 Ky. 481, 151 Ky. 809; I. C. R. R. Co. v. Long, 146 Ky. 170; C. N. O. & T. P. Ry. Co. v. Martin, 146 Ky. 260, 154 Ky. 348; Wickliffe Mfg. Co. v. Wilson, 169 Ky. 468; North Jellico Coal Co. v. Stewart, 173 Ky. 745. The verdict in this case being so clearly and palpably against the evidence a reversal must be ordered.

2. Defendant complains of the argument of plaintiff's counsel to the jury. In view of the fact that the case is reversed for other reasons we will not extend this opinion by commenting upon this point, other than to say that the language used was highly improper and upon a retrial of this case counsel will be careful not to make use of this or similar language. Argument of counsel should be limited to matters within the record, or to fair and reasonable deductions arising from the record.

3. Complaint is also made of instruction one given by the court to the jury, in the use of the expression "decedent was forcibly ejected from the train." There was no evidence to this effect and if the evidence upon the next trial is substantially the same as that in the record before us this expression should not be used.

Wherefore the judgment of the lower court is reversed for further proceedings consistent with this opinion.