## Cocoa Cola Bottling Works of Carrollton v. Lothridge.

### Same v. Same.

(Decided June 12, 1923.)

## Appeals from Carroll Circuit Court.

1.  Municipal Corporations—Verdict for Plaintiff Held Against Evidence Showing Plaintiff's Horse Shied Into Truck.—In an action for injuries received in a collision between a buggy in which plaintiff was riding and defendant's truck, a verdict for plaintiff held contrary to the preponderance of the evidence, which, except for plaintiff's testimony, showed that the truck was standing still, and that plaintiff's horse shied at something on the other side of the street, and ran into the truck.

2.  Appeal and Error—Verdict Flagrantly Against Weight of Evidence May be Set Aside.—While a verdict will not be set aside, where it is only against the preponderance or weight of the evidence, or is against the mere numerical superiority of witnesses, it is not only the right, but the duty, of the court to grant a new trial, under Civil Code of Practice, section 340, subsection 6, when the verdict is flagrantly against the weight of the evidence.

WINSLOW & HOWE for appellant.

J. A. DONALDSON & SONS for appellee

OPINION OF THE COURT BY TURNER, COMMISSIONER— Reversing the first named and affirming the second named appeal.

Appellee as plaintiff instituted the first named action for damages against appellant because of the alleged

negligence of its servant driving its truck against a horse and buggy she was then driving, whereby she was injured.

In that action she recovered a judgment for twenty-five hundred dollars, and thereafter the second action was filed by appellant for a new trial upon the ground of alleged newly discovered evidence, which latter action was dismissed by the court.

At or about the intersection of Sixth and High streets in the city of Carrollton is where the collision, out of which appellee's injuries grew, occurred. Carter, the driver of appellant's truck, drove north on Sixth street and stopped his truck immediately at the southeast corner of Sixth and High streets, and right near to the pavement or curbing, for the purpose of filling his radiator with water from a hose attached to a hydrant over in the yard of Hughes, who lived at the southeast corner of those streets. Immediately opposite that corner and on the northeast corner of Sixth and High streets was Kiper's blacksmith shop, and at the southwest corner of Sixth and High was the residence of Darling. While the truck was so standing at the southeast corner, and near the residence of Hughes, appellee was driving west on High street from a point thereon east of Sixth street. The truck was standing still while the radiator was being filled, but the engine was running slowly; as appellee approached the intersection in her buggy, Carter, the driver of the truck, having finished filling the radiator, got in his truck.

The vital question of fact in the case is whether the horse and buggy driven by appellee drove into the standing truck, or whether the truck had started to move and drove into appellee's horse and buggy, resulting in her injuries.

Only two witnesses were introduced for appellee who were eye-witnesses to the occurrence, or any part of it, appellee herself and her witness Williams.

Appellee states that as she was driving west on High street and on the north side of that street she saw the truck and it was perfectly still, but before she got to the blacksmith shop it was running very slowly and the right front wheel of the truck struck the left wheel of the buggy, and the horse; that this threw her against the dashboard and out of the buggy, and then she describes her several injuries; that after being thrown out she got

back into the buggy, and the truck driver after being requested three times finally backed the truck and led her horse away; that she then drove the horse and buggy to a livery stable some three blocks away. She says on cross-examination that her horse was never frightened, although in her main examination she had spoken of the horse "shaking and trembling;" that although she was driving on the north side of High street the truck came all the way across High street from the south side to where her buggy was on the north side. She also speaks in her evidence of the truck picking up her horse and of her horse's foot being upon the truck, and again, about backing the truck out from under her horse.

It appears that the postoffice in Carrollton is about half a square from the corner where this occurrence took place, and appellee's witness, Williams, states when the collision took place between the buggy and the truck he was at the postoffice and heard the racket and turned around and looked. He first says he saw the two run together, but on cross-examination he said he heard the racket and turned back, but that prior to that he had not seen anything; that he did not see the accident, he only saw that they had run together, and he did not know how it had happened, and did not go up to the place of the accident.

From this evidence of Williams it is plain that it in no sense corroborates appellee as to the manner in which the collision occurred. He was a half square away and saw nor heard anything, until, as he expresses it, he "heard the racket" and then looked up and saw the buggy and the truck in collision, but did not know how the collision was brought about.

This was the whole evidence of the plaintiff as to how the collision occurred.

On the contrary, four witnesses testify for defendant as follows: Nelson Carter, the driver of the truck, testified that he drove north on Sixth street to the corner of High street and stopped his truck right at or near the corner and proceeded to fill his radiator with water by means of a hose attached to a hydrant inside of the Hughes yard; that Homer Hughes was right over inside the yard a short distance from the truck; that the engine was just barely running, but the truck was standing still, and he saw the woman and horse approaching and the horse was shivering and he stopped the engine of the

truck and the horse dashed over to that side of the street while the truck was standing still, and the lady occupying the buggy fell over toward the dashboard but never did fall out of the buggy; that he led her horse on and she left; that the horse never was up on the motor or truck at all, and that from the time he stopped the truck at the corner for the purpose of filling it with water until the time the horse collided with it the car had never moved; that the horse looked like he was scared and was looking toward the blacksmith shop, and started to one side toward the truck.

Another witness, Henry Parrish, says that he was going up the street from the postoffice and saw the horse dodging around the machine, and ran out in the street and caught the horse; that the horse came over towards the truck from the blacksmith shop; that the horse was frightened and he went and grabbed the horse; that the truck was standing still and never did move; that the lady was not thrown out of the buggy that he saw; that he never did see the truck move at all and did not see the horse with its feet up on the truck.

Homer Hughes states that he was standing in the yard at the corner, and Nelson Carter was getting water for the truck; that he saw the buggy appellee was in and it appeared to be coming from the blacksmith shop, and the motor truck was standing still and he never saw it move; that he was just over the fence in the Hughes yard a few feet away from it.

Fred Westrick stated that he was the driver of a Standard Oil wagon and that he come north on Sixth street right behind the truck, which stopped at the corner of Sixth and High streets; that after the truck stopped he came up with it and drove his oil wagon around the truck and started east on High street; that after he drove around the truck he heard somebody say, "Come up, Billy," and looked and the horse seemed to be frightened, and his head was pulled toward the blacksmith shop and he appeared to be running from the blacksmith shop and staggered right into the truck; that from the time the truck stopped at the corner until the horse ran into it the truck had never moved; that what attracted his attention was he heard somebody say, "Come up, Billy," and the horse was scared at something and the woman was trying to pull him over to the right toward the blacksmith shop, and the horse staggered into

the truck; that she had the horse's head pulled around north toward the blacksmith shop and was trying to get him to stay in the road and the horse staggered into the truck and stopped; that the horse never did get on the truck, and that the woman never was out of the buggy.

So that we have four eye-witnesses who state positively the truck was not moving at the time appellee was injured, but was stationary, and that the horse she was driving became frightened at something on the other side of the street and staggered or shied into the stationary truck on the other side. Not only so, we have the admission of appellee herself that when she first saw the truck it was standing still; and we have, in addition, from her two or three statements that appear to be wholly at variance with the physical facts. For instance, she states in substance that the truck ran under or picked up her horse and that her horse's foot was up on the truck. It would seem to be plain, however, that if the truck struck the horse and buggy, as she contends, no part of the horse's body would have been up on the truck, but, on the contrary, it would have been knocked away; whereas if, as stated by the other witnesses, the horse was badly frightened and shied toward the standing truck, it is not at all unreasonable that it might have reared and put its foot or part of its body upon the truck. Not only so, appellee states that the right front wheel of the truck struck the left wheel of the buggy; it is admitted the truck was headed east on High street, right around the corner, and plaintiff states she was traveling on the north side of High street going west. Now the right front wheel of the truck facing east on High street was necessarily on the south side of that street, and if the buggy going west was on the north side of that street and the truck struck it, necessarily the left front wheel of the truck must have struck the buggy and not the right front wheel. The right front wheel of the truck could not have struck any wheel of the buggy unless the buggy had been on the south side of the truck, when all the evidence shows the truck was right against the south curbing and plaintiff's own evidence shows the buggy was on the north side of the street.

Not only is the overwhelming weight of the evidence to the effect that the truck was standing perfectly still at the time of the collision, but the physical facts appear to be wholly inconsistent with the theory of the plaintiff

that the truck could have struck either the horse or the buggy in the manner described by her.

We are constrained, therefore, to hold that the verdict is not sustained by sufficient evidence, and is flagrantly against the overwhelming weight of the evidence.

It is true the court will not set aside a verdict because it is flagrantly against the evidence where it is only against the preponderance or weight of the evidence, nor because of the mere numerical superiority of witnesses; but when the verdict is flagrantly against the weight of the evidence, it is not only the right of the court to grant a new trial, but its duty to do so. Section 340, Civil Code, subsection 6; L. & N. Railroad Co. v. Baker, 183 Ky. 795; and C. N. O. & T. P. Railway Co. v. Martin, 154 Ky. 348.

In view of our conclusion on the first named appeal it becomes unimportant to consider at length the correctness of the ruling of the trial court in dismissing the action for a new trial. It is sufficient to say the court properly sustained the demurrer to the petition for a new trial, and the judgment on that appeal is therefore affirmed.

Many other questions are raised on the first named appeal which we have not deemed it necessary to consider; but none of such questions is passed upon, and they are all expressly reserved.

The judgment on the first named appeal is reversed with directions to grant appellant a new trial, and for further procedings consistent herewith.