### HOUSTON, E. & W. T. RY. CO. et al. v. LAVINE et ux. (No. 8384.)*

(Court of Civil Appeals of Texas. Galveston. June 27, 1923. Rehearing Denied Nov. 6, 1923. Dissenting Opinion Nov. 7, 1923.)

**1. Appeal and error ⊜1012(1)—Findings to be set aside, if based on testimony which cannot be true on any reasonable hypothesis.**

While it is the duty of appellate courts to sustain findings of trial court or jury founded on sufficient credible testimony, not so as to findings based on testimony irreconcilable or entirely out of harmony with human observation, reason, and experience; that is, if the circumstances, conditions, and physical facts are such that the testimony cannot be true on any reasonable hypothesis, the verdict and the judgment thereon should be set aside on appeal.

**2. Railroads ⊜348(2)—Jury's finding of place of accident held against weight of evidence.**

Testimony of plaintiff's witnesses to fix as the place of the accident a crossing, a third of a mile from which deceased's body was found on the railroad track, one of them testifying to seeing the accident but saying nothing about it for a week, the others (plaintiffs) as to what they found along the track, *held* so out of harmony with all human observations, reason, and experience, and contradictory of the undisputed facts, that the jury's finding, based solely on it, is so against the great weight and preponderance of the evidence that it should not be permitted to stand.

**3. Railroads ⊜350(28)—Evidence held not to show contributory negligence as matter of law.**

Testimony in crossing accident case, based on safety gates being open and no signal given, that deceased did nothing to discover the approaching train, but walked on the railroad in front of the train without looking or listening, *held* not to show contributory negligence as matter of law.

**4. Railroads ⊜352—Answers to special issues in crossing accident case held not finding of contributory negligence.**

Jury's special findings in crossing accident case, based on the safety gates being open and no signal given, that deceased did nothing to ascertain the approach of the train, and that, had he exercised ordinary care at or before he went on the track he would have heard the approach of the train, *held* not a finding of contributory negligence.

---

⊜For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Writ of error granted December 5, 1923.

On Motion for Rehearing.

**5. Appeal and error ⬱1003—Province of jury not invaded by appellate court holding against verdict that testimony is not reasonable.**

Whether the testimony on which a verdict is based is under the circumstances shown, and, when measured by the common experience of men, reasonable (a question to be tested by the inherent soundness or reasonableness of the conclusion reached), is to be decided by an appellate court for itself, when presented to it; and, in determining that so tested it is not reasonable, it does not invade the province of the jury.

**6. Railroads ⬱348(2)—Finding accident was at crossing held against evidence.**

Jury's finding that deceased was struck by the train at the crossing, one-third of a mile from which his body was found, *held* so against the undisputed physical facts and the great weight and preponderance of the evidence that it should not be allowed to stand.

**7. Appeal and error ⬱1173(1)—Though brief was filed for only one appellant, held judgment being reversed as to it should be set aside as to the other.**

Where two railroad companies, the H. and the T., were sued for death claimed to have been caused at a crossing by a train owned and operated by the H. Company, the only negligence chargeable to the T. company being failure of the gates at the crossing to properly function, the judgment against both should be treated as an entirety, and, being reversed as to H. company, on the ground that the evidence did not warrant the finding that the accident occurred at the crossing, should be set aside as to the T. Company, even if it, though having appealed, did not file a brief; the liability of the T. company depending on that of the H. company.

Graves, J., dissenting in part.

Appeal from District Court, Harris County; W. E. Monteith, Judge.

Action by Joe Lavine and wife against the Houston, East & West Texas Railway Company and another. Judgment for plaintiffs, and defendants appeal. Reversed and remanded.

Baker, Botts, Parker & Garwood and Garrison & Watson, all of Houston, for appellants.

Chas. O. Guynes and Bryan, Dyess & Colgin, all of Houston, for appellees.

LANE, J. This suit was instituted by Joe Lavine and wife, Hannah Lavine, against the Houston East & West Texas Railway Company and the Texas & New Orleans Railroad Company, to recover damages alleged to have been suffered by them by reason of the death of their minor son, Herman Lavine.

The plaintiffs alleged: That on or about the 8th day of July, 1921, their said son, a boy of 14 years of age, while attempting to cross over the track of the Texas & New Orleans Railroad Company, where. the same is crossed by the Wallisville public road and Cushing street, was struck and killed by one of the defendant's trains. That the crossing in question was a public crossing, much used, and dangerous. That the defendants were negligent in the following particulars: First, in failing to exercise ordinary care to see that the gates erected at said crossing were in proper condition and would close when trains were approaching and passing said crossing; second, in failing to sound the whistle and ring the bell of the engine, as the law requires; third, in not placing a watchman at said crossing: fourth, in running their train, which struck Herman Lavine, at an excessive rate of speed. They alleged that these acts of negligence, concurring with others, were the proximate cause of the death of the deceased.

The defendants answered by general demurrer, general denial, and by a plea of contributory negligence on the part of the deceased, and specially alleged, among other things, that the deceased was not struck at the crossing, as alleged by plaintiffs, but that he was a trespasser upon defendants' premises and was struck and killed at another place than said crossing.

The cause was submitted to a jury on special issues in answer to which the jury found:

(1) That the deceased was struck and killed at the point of the intersection of Cushing street and the railway track, as alleged by plaintiffs.

(2) That the defendants did maintain safety gates at said crossing.

(3) That the defendants did not exercise ordinary care to see that said safety gates were closed as the train which struck deceased approached said crossing, and that such failure was the approximate cause of the death of the deceased.

(4) That the bell of the engine, which was propelling the train which ran over and killed the deceased, was not ringing as the train approached the crossing in question at the time of the accident.

(5) That the deceased, at the time, or before the time, he was struck and killed, did nothing to ascertain the approach of the train which struck him.

(6) That the failure to ring the bell was an act of negligence on the part of the employés of defendants, and that such failure was the proximate cause of said accident.

(7) That had the deceased, Herman Lavine, exercised ordinary care at or before he went upon the railway track he would have heard the approach of the train which struck him.

(8) That the damage suffered by the plain-

tiffs by reason of the death of their son was $2,000.

Judgment was rendered in favor of plaintiffs against defendants, jointly and severally, for the sum of $2,000, and from such judgment both defendants have appealed.

Assigning reasons for reversal of the judgment rendered, appellants, by their propositions 1, 4, and 5, substantially contend that it is shown by the great weight and preponderance of the evidence, as well as by the physical facts shown, that the deceased was not struck and killed at the Cushing street crossing, as alleged by the plaintiffs, but that he was run over and killed at a point upon the premises of the defendants upon which he was trespassing, some 2,000 feet west of said Cushing street crossing, and that it was further shown by said great weight and preponderance of the evidence and physical facts that appellants were not guilty of the negligence alleged by the plaintiffs, and therefore judgment should have been rendered for appellants. And by propositions 2 and 3 they contend, substantially that, if they are mistaken in the contention first presented, and in the event it is assumed that the testimony of Lewis Thompson, the only person who testified to seeing the collision of the train with the deceased, is true, then and in these circumstances it is shown by the undisputed evidence and the great weight and preponderance of the evidence that the deceased was guilty of an act of negligence contributing to his death in going upon the railway track in front of the train which struck and killed him, without looking or listening for the approach of said train, as was shown by the testimony of the witness Thompson and as found by the jury.

[1] After a most careful examination and consideration of the statement of facts, we have reached the conclusion that the finding of the jury that the deceased was struck and killed at the Cushing street crossing is so against the great weight and preponderance of the evidence as to be manifestly wrong. While it is the duty of appellate courts to sustain the findings of trial court or jury founded upon sufficient credible testimony, they are not required to sustain findings based upon testimony which is irreconcilable or which is entirely out of harmony with human observation, reason, and experience. In other words, if the circumstances, conditions, and physical facts are such that the testimony cannot be true upon any reasonable hypothesis, the verdict of the jury and judgment rendered, based upon such testimony, should be by the appellate court set aside.

The important inquiry then is, Was Herman Lavine struck and killed at the Cushing street crossing, as alleged by the plaintiff, or was he so struck and killed some 2,200 feet west of said crossing, and upon the in-

closed premises of the defendants? This inquiry is important in that, if the deceased was killed while trespassing upon the inclosed premises of the defendants, they were under no duty to keep a lookout for his safety, unless they had reason to anticipate his presence upon said premises, and under such circumstances plaintiffs could not recover, there being no allegation of discovered peril. But it was the duty of defendants to keep a lookout for persons who might be about to cross its track at Cushing street crossing, to ring the bell and sound the whistle of their engine as the train approached said crossing, and generally to use such care to prevent the injury complained of as a person of ordinary care and prudence would have exercised under like or similar circumstances, and hence, if it be shown that the accident occurred at said public crossing and that the defendants failed to keep such lookout or to perform some one or more of the other duties mentioned, and that such failure was the proximate cause of the accident, the judgment for the plaintiffs should not be disturbed.

[2] This brings us, then, to the further pertinent inquiries: First, was the testimony of the witness, Lewis Thompson, and the testimony of plaintiffs Joe and Hannah Lavine, relative to the point of the accident, upon which the jury found that the deceased was struck and killed at the Cushing street crossing, so out of harmony with human observations, reason, and the common experience of all men, and so irreconcilable with the undisputed facts, as to render it insufficient to support such finding of the jury; it being shown that the engineer and fireman on the engine which struck the deceased testified that they were keeping a lookout, as they crossed Cushing street crossing, and that their engine did not strike any one at said crossing; and it being shown that other witnesses had testified to certain facts, which, if true, would tend to show that the deceased was not struck at said crossing, but that he was run over and killed 2,200 feet west thereof; and it being further shown, by the undisputed evidence, that the body of the deceased was found lying on the railway track of defendant some 2,200 feet or more west of said crossing on the premises of defendant; that one of his arms was lying across one of the rails of the track and was so crushed as to be held to the body by the leaders or ligaments only, and that one of his legs was lying across the opposite rail and was so crushed as to be held to the body by ligaments only; that his scalp was split, and that his cap was found close to where his body was found. In other words, is it not true that the great weight and preponderance of the evidence is so against the finding of the jury that the deceased was struck at Cushing street crossing as to ren-

der such finding manifestly wrong? We think so.

The undisputed evidence shows that the railroad track upon which the accident occurred ran practically east and west; that Cushing street crossing lies between the Englewood railway yards and the creosote plant of defendants: that the yards were east and the creosote plant west of said crossing; that the main track and four spur or side tracks passed over said crossing; that the body was found in a few minutes after the death of the deceased on the main line track of defendants' .2,200 feet west of said crossing, in the condition as hereinbefore described; and that the cap worn by deceased was , found close to where the body was found.

The effect of the testimony of those who removed the body to the undertaker and who undressed it was that no parts or pieces of the body were missing.

The engineer and fireman in charge of the train in question testified that they knew no one was struck at said crossing by their engine.

As against the testimony of the witnesses mentioned and the undisputed physical facts, appellees' witness Lewis Thompson testified that, about 9 o'clock p. m. on the night of the accident, he was traveling on Cushing street going north: that when he got near the railway track he saw the deceased, who was about 10 or 15 feet in front of him and about 40 feet from the track, and who was also going north; that the deceased did nothing to discover the approaching train, but walked upon the railway track in front of the approaching train without looking or listening; that he saw the engine strike and kill the deceased; that the train passed said crossing at a rate of speed of 25 miles per hour; that as soon as the train passed he went on home without looking to see whether or not the deceased was killed or injured, as he did not want to be bothered with him; that he did not tell his wife that any such accident had occurred, *nor did he tell any one that he had seen the accident until about a week thereafter,* and that how he came to then tell of seeing it was that he was on a street in the city of Houston and heard Joe Lavine telling about his son being killed, and that he then told Joe that he had seen the accident.

Appellee Joe Lavine testified that his son was killed on Wednesday night, and that he and his wife went down to the Cushing street crossing about 1 o'clock on Friday thereafter; *that the first time he knew his son was killed on the crossing was when Lewis Thompson told him and that after Lewis Thompson told him that his son was killed on the crossing, he and his wife went down to the crossing,* and that he saw some blood on a sill that supported a trestle west of and near

said crossing; that it was human blood; that he knew it was human blood, because if it was animal blood it would be just like any other blood. Testifying further, he said:

"I just thought that was blood. I saw it there. I went down there looking for blood, and I saw it, and I believe it was blood. I was trying to find blood from the place he was killed."

Testifying further, he said that when he found this blood he and his wife went on up the railroad track and found a piece .of his son's jumper, a blue jumper; that he knew it was a piece from his son's jumper because his wife had made the jumper at home; that after finding this piece of jumper they went a little further and found a piece of flesh off of his son's ankle laying on the track, and a little further on they found another piece of flesh; that the pieces of flesh they found were pieces of human flesh.

Appellee Hannah Lavine testified, with reference to finding the pieces of flesh, practically as did Joe Lavine.

As before stated the testimony of the witnesses Thompson and Lavine was the only evidence tending to show that the deceased was struck at the crossing.

If it be the theory of appellees that the deceased was caught under the pilot of the engine and dragged 2,200 feet to the point where his body was found, such cannot be sustained, for it was shown that no part of the skin of the body was broken except on the head and on the leg and arm, which were mashed by the wheels ·of the cars as they passed over them, and it was also shown that the cap of the deceased was found near the place where the body was found. Can any person of ordinary intelligence believe that the body could have been dragged 2,200 feet under this train without dislodging the cap from the head before it reached the point where it was found? Or that the body could have been so dragged· without being mutilated?

Again, if the theory is that deceased was caught on the pilot and his body finally dropped off where it was found, then the testimony of Lavine and wife that they found parts of the body near the crossing is refuted, for if the body was lodged on the pilot. it would not have been possible that any part of the body was severed until it was dislodged from the pilot.

Having reached the conclusion that the testimony of the plaintiffs' witnesses is so .out of harmony with all human observation, reason, and experience, and contradictory of the undisputed physical facts, we have reached the further conclusion that the finding of the jury, based solely upon said testimony, is so against the great weight and preponderance of the evidence that it should not be permitted to stand.

[3, 4] We cannot agree with the contention

of appellants that if the testimony of Lewis Thompson be true that it shows that deceased was guilty of contributory negligence as a matter of law, or that the fifth and seventh answers of the jury to special issues submitted was a finding that he was so guilty. Galveston-Houston Electric Co. v. Patella (Tex. Civ. App.) 222 S. W. 615; S. A. & A. P. Ry. Co. v. Votaw (Tex. Civ. App.) 81 S. W. 131.

Having reached the conclusion that the judgment is so against the great weight and preponderance of the evidence as to be manifestly wrong, as hereinbefore expressed, the same is reversed and the cause is remanded.

Reversed and remanded.

GRAVES, J. I concur in the reversal on the ground that the weight and preponderance of the evidence is so against the findings of the jury that this court in good conscience should not permit the judgment to stand. I further agree to the conclusion stated as to the issue of contributory negligence upon the part of the deceased. Further than this necessarily involves, I do not desire to be committed to the expressions in the court's opinion.

On Motion for Rehearing.

LANE, J. Appellees have filed their motion for rehearing and, with much vigor and apparent misconception of our holding, have attacked our conclusion that the finding of the jury that the deceased was struck and killed at the crossing in question was so against the great weight and preponderance of the evidence as to require a reversal of the judgment based upon such finding.

It will no doubt be conceded by appellees that unless this finding of the jury, can be sustained the judgment should be reversed.

[5, 6] It is contended that we have invaded the province of the jury, in that we have found, contrary to the findings of the jury, that the testimony of Thompson and Lavine and wife, witnesses for the plaintiffs, was untrue, and that the testimony of the witnesses for the defendants was true. It is apparent from our opinion that such contention is untenable. We have, in substance, held that the testimony of Lewis Thompson and of the plaintiffs, Lavine and wife, in the manner given by them, when confronted with the undisputed facts—that is, that the body of the deceased was found more than 2,200 feet from the crossing—and when confronted with the testimony of several disinterested witnesses that the body was found with one arm lying across the south rail of the railroad and one leg across the north rail, both disclosing that the body was lying just where the wheels of the cars or car which crushed them passed over them, and that no part of the body was missing, and

confronted with the testimony of the train crew, was so against the great weight and preponderance of the evidence as to fail of that probative force necessary to support a judgment in favor of appellees.

We have suggested that the unreasonableness of the testimony of Thompson and Lavine, when confronted with the facts above stated, so weakens the same that it should not control over undisputed facts and the overwhelming testimony of disinterested witnesses refuting it.

Whether the testimony of a witness is reasonable when measured by the common experience of men is not to be tested by the reasonableness of the individual who makes the measurement, but by the inherent soundness or reasonableness of the conclusion reached. As said by our Supreme Court in Gulf, C. & S. F. Ry. Co. v. Gaddis (Tex. Com. App.) 208 S. W. 895:

"When such question is presented to an appellate court for decision, such court must decide the question for itself, untrammeled by what other minds may have concluded, and with the consciousness that its own conclusion may not in every instance meet the full approval of others equally capable but not charged with the ultimate duty of decision. A different conclusion by other minds is, of course, persuasive. Which fact makes valuable the opinions of other jurisdictions not binding, as a matter of law, upon this jurisdiction. But in the last analysis each court is charged with the duty and must for itself determine the question of reasonableness of a particular conclusion from a given undisputed state of facts."

Applying then the rule last stated, we are to decide the question as to whether the testimony of Lewis Thompson and the plaintiffs, under the circumstances shown, and when measured by the common experience of men, is reasonable.

It occurs to a majority of this court that the conclusions reached by us are inherently sound and reasonable and in harmony with the common experience and observation of all men. Therefore we could not conscientiously affirm the judgment of the trial court, based, as aforesaid, upon the finding of the jury that the deceased was struck and killed at the crossing. While it is the duty of appellate courts to give credence to probative evidence upon which the judgment is based, it need not believe the incredible or accept as true testimony which is entirely out of harmony with observation and experience. If the circumstances and conditions shown are such that the testimony cannot be true upon any reasonable hypothesis, a verdict based thereon should be set aside. Sandy Valley & E. Ry. Co. v. Hughes, 181 Ky. 558, 205 S. W. 607.

"An appellate court, whatever deference it may owe to a jury's verdict, is not required to go blind." Fort Worth & D. C. Ry. Co. v. Hart (Tex. Civ. App.) 178 S. W. 795.

A judgment based upon a verdict which is, in the opinion of the appellate court, contrary to the overwhelming weight of the testimony, should be by that court reversed. It is not only the prerogative, but the duty of said court in such case to reverse the judgment. T. & N. O. Ry. Co. v. Wagner (Tex. Civ. App.) 224 S. W. 377, in which writ of error was denied; Ry. Co. v. Hart (Tex. Civ. App.) 178 S. W. 795; Ry. Co. v. Loeffler (Tex. Civ. App.) 59 S. W. 558; Sandy Valley & E. Ry. Co. v. Hughes, 181 Ky. 558, 205 S. W. 607; Ry. Co. v. Baker's Adm'rs, 183 Ky. 795, 210 S. W. 674; Schmitt v. Oil Co. (Mo. App.) 221 S. W. 389; Hines v. Roan (Tex. Civ. App.) 230 S. W. at page 1082.

In Ry. Co. v. Loeffler (Tex. Civ. App.) 59 S. W. 558, Justice Pleasants, speaking for this court, said:

"We fully recognize the importance of a strict observance by the courts of the rule that jurors are the exclusive judges of the credibility of witnesses, and of the weight to be given to their testimony, but this rule neither requires nor contemplates that the mind and conscience of the court shall be entirely and unreservedly surrendered to the judgment of a jury upon all questions of fact that may arise in the trial of a case. When the verdict of a jury is so against the weight and preponderance of the evidence as to be clearly wrong, it is the duty of the court to set such verdict aside; and the grave responsibility thus placed upon the judiciary of determining whether or not the evidence in a particular case is legally [reasonably] sufficient to deprive a citizen of his property cannot be evaded."

In Hines v. Roan, supra, it is said:

"It is well settled that, where the verdict of the jury is manifestly wrong, it is the duty of the court to reverse the case and remand for another trial"—citing many cases.

In Ry. v. Baker's Adm'r (Ky.) supra, it is held that, where a verdict is flagrantly against the weight of the evidence, it is the appellate court's duty to grant a new trial.

In Schmitt v. Oil Co. (Mo.) supra, it is held that a verdict based on evidence which seems improbable and contrary to physical facts may be set aside by the appellate court.

Conceding that the rule as announced by the decisions cited and from which we have quoted is sound, the important inquiry is: Is the finding of the jury in the instant case so against the great weight and preponderance of the evidence that it should not be permitted to form a basis for transferring the property of the appellants to the appellees? In the exercise of our best judgment, and in the conscientious performance of our duties, the majority of this court have answered this affirmatively.

We have in our original opinion faithfully stated the substance of the testimony of Lewis Thompson and of Joe Lavine and wife, witnesses for the plaintiffs, and there-fore we deem it unnecessary to repeat it here. But, as shown by appellees' motion for rehearing, our original opinion has been misquoted, and, as it seems that both counsel for appellees and Justice Graves have misunderstood the effect of the testimony of the witness L. P. Jackson, the tower man, and J. E. Phelps, a watchman, we deem it advisable to cite their testimony in more detail than was done in the original opinion.

Jackson testified that at the time of the accident he was employed as an extra tower may by the railroad company, but that he left their service in the year 1921 and had not been in their employ since that time, that in going to his work on the night of the accident in question he walked down the track. Continuing, he testified as follows:

"As I was walking down the track that night I stepped on this body. After passing and going and getting a lantern, I found what appeared to be a colored boy about 18 or 20 years old. At the time I first stepped on it I couldn't tell what it was. When I first found the boy I went down and got the watchman at the creosote plant—I believe his name was Phelps—and then I went back and took the body from between the rails so the next train would not run over him. I know where the Wallaceville and Cushing street crossing is; the tower is east of the crossing. The point at which I found that body was something like a quarter of a mile or more west of that crossing. I pointed out that place to an engineer who was making a map; I showed him where I found the body. The point where I found the body is correctly shown on this map which is now shown to me."

He testified that the body was found in the creosote yard, which was inclosed with a fence. Continuing, he testified:

"When I found the body it was laying stretched out, with one leg on the rail, and the other arm was laying opposite (across) the other rail; in other words, his head was towards town. Just for instance, this is him; he had his left foot on the rail, which would throw his foot on the outside of the rail, but it was still hanging, it was not cut off. * * * About a rail or a rail and a half length from the body we found his cap; that is, we took it to be his cap. When I stepped on the body the thought struck me that it was a human being; I couldn't tell for certain as it was pretty dark. I went a few steps after I stepped on the body, and then I went back to see if it was a human, and I didn't have a match or a light, and I went as close as I could guess, without feeling for the body, to see if I could tell whether it was anybody, and I decided that I could distinguish something which looked and proved later to be his drawer legs—his pants were pulled up to his knees and his drawers were showing, and I took it to be a human, and then I went down and called Mr. Phelps, the watchman, and he and I and two other fellows, I think they were negroes, went up there with a lantern. After finding that it was a human body we lifted it off the track, because a pas-

senger train, No. 101 or 107, was coming; we lifted it off the track to keep it from being run over again. I called Westheimer's ambulance then, and I stayed there until the ambulance came. The ambulance came down to the Cushing Avenue road and stopped there, and they brought the cot over to where the body was. While the ambulance was coming I put the body on a push car and took it to the pump house. It has been so long ago I had almost forgotten that. I stayed with the body from the time I found it until the ambulance came. At the time I found the body it was just barely warm. I think the blood was clotted, and I figured he had been dead somewhere between 15 and 20 minutes."

J. E. Phelps testified that on the night of the accident he was in the employ of the Texas & New Orleans Railroad Company as watchman; that on the night of the accident he was making his rounds, and Jackson, seeing his lamp, called to him from the main line track and told him to bring his lamp. Continuing, he testified as follows:

"I went over there, and he said, 'There is somebody dead down the track, or it looks like it.' He said it was so dark he could not tell, and he said, 'Come on quick, and let's go down there.' We went down there and found the boy with his head west, in the center of the inbound track, which is on the north side. He asked me to go with him to the office and ring for an ambulance, and we rang up Mr. Westheimer, and they came down in about 20 minutes. We took a push car from the plant and went down there and got the boy; they couldn't get the ambulance down there. After we first went down there I thought he ought not to be moved or touched without a jury or something, so the man with the ambulance went back and rang up Mr. Westheimer, and he said, 'As you are out there you had better bring him on.' We had taken the boy out of the main line, and put him between the lines because if another train came along with low brake rods it would have torn him up, and we took chances and put him between the tracks, and then put him on a push car and took him down to the crossing."

Testifying further, he said:

"When I went up to where that body was found, with Mr. Jackson, I stayed there until the body was put in the ambulance."

L. A. Bingham, ambulance driver, testified:

"I am employed by Mr. Westheimer, and was so employed in June, 1921. I had occasion to go out close to the creosote plant on the night of June 8, 1921, and pick up a negro boy. Between 8:30 and 9 o'clock in the evening, or early part of the night, we got a call to go to Englewood yards, and we had to go to the east end, and they told us the body was down the track, and we got a push car and went down there with the cot. We had to have an inquest, and we phoned the judge, and he said, 'Bring the body in.' We found the body just off the inbound track; it had been moved, and I don't know whether it was hit on the main track

or a switch. The body was at the west end of the creosote plant yards, or the west end of the sheds. It was 1,000 feet or more west of the boiler and engine room. We put the body on the cot, and then we put the cot on the push car, and pushed it down as close to the ambulance as we could, and then carried it to the ambulance. The foot was crushed in the ankle, but it was not entirely off; the leaders were holding the foot to the body, and the arm was cut. The arm was not entirely severed from the body, the leaders were holding it; it was mashed this way, and there were no pieces off the body at all. I never saw anything that indicated that there were any pieces of flesh torn off the body anywhere; the arm and leg were simply crushed."

Again he said:

"I did not dress the body, but undressed it. The body was not mangled and covered with blood so very much. The clothes were not covered with blood. His head was bruised, mashed, or crushed, I don't know how it was done. There wasn't any part of the foot cut off, it was crushed. There may have been some part of the foot crushed off, but there was nothing to pick up, I will swear that there was no part of the flesh off the body."

A. W. Bunson, a surveyer, testified that he measured the distance from where the body was found by Mr. Jackson to the crossing and found the distance to be 2,227 feet.

Both the operatives of the locomotive propelling the train, some part of which passed over the deceased, testified that no one was struck by their locomotive on the night of the accident.

Joe Lavine, father of the deceased, testified that his son would frequently go to town to the picture shows, and that on the night he was killed he told him that he was going to look for a job.

We are not informed as to whether or not the deceased had attempted to catch the train in appellants' yards and in such attempt fell between some of the cars which passed over his body, as suggested in the motion for rehearing, but, basing our conclusions upon the evidence as a whole, we are still of opinion that the finding of the jury that the deceased was struck by the pilot of the engine at the street crossing, a point 2,227 feet from where his body was found, is so against the undisputed physical facts and the great weight and preponderance of the evidence that it should not be permitted to form the basis for depriving appellants of their property.

The motion is overruled, Justice GRAVES dissenting.

[7] Since appellees filed their motion for rehearing they have filed a supplemental motion, and thereby, for the first time, present the contention that the Texas & New Orleans Railway Company has filed no brief in this court, and insist that we should set

aside so much of our judgment as revises the judgment against that company.

The second amended petition, upon which appellees went to trial, was filed on the 11th day of February, 1922.

The firm of Garrison, Pollard & Berry, now Garrison & Watson, were the common attorneys for both of the defendants, and as such attorneys filed a joint answer for said defendants. All through the trial of said cause said attorneys represented both defendants jointly. Upon judgment being rendered against both defendants, a motion for a new trial was filed by said attorneys, and, upon such motion being refused, a joint appeal bond was executed by both defendants on the 20th day of May, 1922, their signatures being signed thereto by said common counsel, Garrison & Watson. Thereafter, the transcript, filed in this court on the 9th day of August, 1922, was applied for by said attorneys and was received from the clerk of the trial court for both defendants by said common attorneys.

Briefs were filed in this court by Garrison & Watson on the 25th day of April, 1923, which on their face appear to be briefs of the Houston, East & West Texas Railway Company only, but, as we knew that Garrison & Watson were the common attorneys for both appellants, and as it seemingly appeared that all through the proceedings both parties treated the pleadings filed by them as the pleas of both defendants, and as no motion had been made to dismiss as to the Texas & New Orleans Railway Company, this court assumed that it was understood by both parties that said briefs were filed as the briefs of both appellants, and on the ——— day of June, 1923, rendered judgment reversing the judgment of the trial court as to both appellants.

After such judgment had been so rendered by us, appellees, on the 11th day of July, 1923, filed their motion for rehearing, and still no contention was made that the briefs filed by Garrison & Watson were not the briefs of both appellants, but thereafter, on the 12th day of July, appellees filed their motion asking that so much of our judgment as reversed the judgment as against the appellant Texas & New Orleans Railway Company be set aside, because of its failure to file briefs.

It is evident, we think, that the briefs filed by Garrison & Watson were in fact filed for both parties, and were so treated by all parties throughout the entire proceedings. Appellees replied to said briefs and made no objection to their being considered as briefs of both appellants until it was too late for the Texas & New Orleans to file briefs before disposition of the appeal. Under such circumstances, we think it would be manifestly unjust to grant appellees' supplemental motion.

But, regardless of the question of whether the Texas & New Orleans Railway Company has properly invoked the jurisdiction of this court, we are of the opinion that the nature of the case made by the pleadings and evidence is such that justice requires that the judgment should be treated as an entirety, and when reversed as to one defendant should be set aside as to both.

It is shown by the uncontradicted evidence that the train by which the deceased was killed was owned and operated by the Houston East & West Texas Railway Company. The only negligence chargeable to the Texas & New Orleans Railway Company was the failure of the gates at the crossing to properly function. It is therefore manifest that if the deceased was not struck by the train on the crossing, as alleged by appellees, the Texas & New Orleans Railway Company is in no way responsible for his death.

The majority of this court having reached the conclusion that the evidence is insufficient to sustain the finding of the jury that the deceased was struck on the crossing, it would be a great injustice to permit the judgment against the Texas & New Orleans Railway Company to stand, and this court is not so hampered by technical rules of procedure as to be powerless to prevent such injustice.

After a review of the authorities upon the question, our Supreme Court, in the case of Hamilton v. Prescott, 73 Tex. 566, 11 S. W. 549, reaches the following conclusion:

"We think the conclusion to be deduced from these apparently conflicting cases is that this court when it finds error in the proceedings of the lower court as to any party to the judgment and not as to another, and that a proper decision of the case as to one is not dependent upon the judgment as to the other, will reverse in part and affirm in part. But where the rights of one party are dependent in any manner upon those of another it will treat the judgment as an entirety, and where a reversal is required as to one it will reverse the judgment as a whole."

It is true that the case in which this conclusion was reached was one of principal and surety, but the rule announced is not confined to that character of cases.

The word "rights," as used in the above quotation, necessarily includes its correlative, "liabilities," and it is clear from the pleadings and undisputed facts in this case that the liability of the Texas & New Orleans Railway Company is dependent upon that of the Houston East & West Texas Railway Company.

In the case of Thompson v. Kelley, 100 Tex. 536, 101 S. W. 1074, which was a boundary suit in which there was an adjustment of boundary lines of various tracts of land between a number of parties, our Supreme Court held that the appeal of some of the parties carried up the entire case, and that

a reversal of the judgment as to the parties who appealed required its reversal as to all of the parties whose interest was in any way dependent upon the rights of the appealing parties.

Our conclusions upon this question are further supported by the cases of Ferguson v. Dickinson (Tex. Civ. App.) 138 S. W. 221, and Bell Oil Co. v. Price (Tex. Civ. App.) 251 S. W. 560.

We think the supplemental motion for rehearing should be refused, and it has been so ordered.

GRAVES, J., concurs in our disposition of this motion.

GRAVES, J. (dissenting). On original hearing, with at least some degree of reluctance, I concurred in the reversal of this judgment on the ground that the weight and preponderance of the evidence was against the jury's verdict to the extent that this court should not permit it to stand; but on rehearing, after again going over the statement of facts, I think that view erroneous, and that warrant does not exist for this court's overturning the action of both jury and trial court.

The idea that then seemed to me to underlie (and still does) the conclusions of my Associates—that is, that the testimony of Joe and Hannah Lavine, parents of the dead boy, and Lewis Thompson, the asserted eyewitness to the accident, must be discarded as incredible—never has appealed to me, but I before thought its real force overbalanced and outweighed by the opposing evidence presented, after making due allowance upon both sides for the frailties of human nature and the imperfections and inaccuracies of human powers; even that view I can no longer entertain. I never thought the statements of Lavine and wife that they found human blood and flesh on the railroad track and of Lewis Thompson that he told no one about the accident until about a week thereafter "so out of harmony with all human observation, reason, and experience" as to be unworthy of belief, and theretofore qualified my original concurrence. These witnesses were all ignorant negroes, and as the counterfeit presupposes and proves the genuine, so ofttimes the very exaggerated, inaccurate, and unintelligent way in which a negro tells of or about a tragic occurrence, as well as the superstitious and irrational action he displays in consequence of close relationship to it, leads not away from, but rather toward, an acceptance of the basic fact of the thing.

And right here lay the domain of the jury in this instance; they were men of ordinary experience and intelligence, familiar as such citizens are with the character, the traits, the tendencies, of negroes like these—who lived among them; the witnesses themselves, without an impeaching fact or circumstance having even been offered in evidence, were before them in person, affording an opportunity at close hand for a fair and reasonable appraisal of the net value of what they testified to. When in the exercise of their proper prerogative the twelve "good men and true" have chosen in such circumstances as here obtained to accept the version of such witnesses, I do not think it lies within the power of this court to veto or nullify that action.

It is so serious a thing in our system of jurisprudence for a court to invade the sphere of the jury that anathemas against it add spice to our law books throughout their chroniclings.

That it is such an intrusion for this verdict to be set aside seems to me demonstrable from a consideration of the state of the evidence. The trial court twice so held, and, although possessing like power with this tribunal in the matter, as many times refused—against the identical objections this court has sustained—to interfere, in denying motions, first, to set aside the jury's finding that the accident occurred at the crossing, and, second, for a new trial. Its very deliberate judgment, therefore, was that the testimony of Thompson and the Lavines, whatever the confrontment from the other side, was neither unreasonable nor "so against the great weight and preponderance of the evidence as to fail of that probative force necessary to support a judgment in favor of appellees."

Thompson testified:

"On June 8, 1921, I saw an accident on the Wallaceville or Texas & New Orleans railroad crossing just east of the creosote works; I saw the boy when he got killed there. He was crossing the railroad when he got killed. At that time I was coming along there fixing to cross. Just as I came to go upon the crossing the safety gates were up. This boy was about 15 or 20 feet ahead of me. The boy was going north across the crossing at that time, and I was going the same way. I have good hearing and good eyesight. As near as I can get at it the time I am talking about was about 9 o'clock at night. The train that killed the boy was going west or towards town. Before that train killed the boy I did not hear the ringing of any bell or the blowing of any whistle. I have ridden on trains and in automobiles, and I am a pretty good judge of the speed a train is making. By standing there looking at that train I would say it was going about 25 or 30 miles an hour. That was a freight train. I don't remember how many box cars there were in that train, but it was a pretty short train, it had a caboose. I did not notice the number of the engine on the tender, and I didn't see the name of it. I did not see anybody else there at the time this boy was killed. The boy looked to be about 15 or 16 years old. I did not hear that train coming, and I like to have gotten run over myself. When I went to go across the track the safety gates were up. When the boy was killed he

was right on the crossing. That train came up on me suddenly before I knew anything about it. I saw the train just as it hit the boy. * * * I did not see him any more after the train hit him and I couldn't say whether it knocked him to one side in the ditch or up in the air. I know the engine hit him; the pilot hit him first. By pilot I mean the cowcatcher. I said I didn't know which way it knocked him, I just know it hit him."

Surely, when measured by the common experience of men, there is nothing inherently unreasonable about this. Does it become so merely because he, an ignorant and superstitious negro, further swore that he did not tell any one of this gruesome happening until about a week had passed?

There is, however, at least circumstantial corroboration of what he thus says he was an eyewitness to in the testimony of both the boy's parents. Joe Lavine, the father, in substance testified:

"When my wife and I went down to that crossing on Friday after the killing on Wednesday night, and the first thing I saw on the crossing on the right side going west, after we got off the road, right up against that big sill, was blood. It was not the sill of the cattle guard, it is a big piece of timber or a stringer where the rail goes across this road; on the inside of the rail was blood. We then went on up the railroad track, and here is the trestle bridge, and here is the road crossing, and right about the center is the place I saw the blood on the flanges of the rail, and I saw some on the other side. I also found a piece of his jumper; it was a blue jumper. I knew it was his because it was made at home; we always had them made at home for him to wear, and I had one made for myself, and I knew it was his. We went a little further and found a piece of flesh off his ankle lying in the track, and we found another piece of flesh, but the ground had been stirred up with gravel, and we couldn't see any further.

"We saw some blood along the side of that sill. I saw a big splotch of blood there; I didn't measure to see how big that splotch was, but it looked as large as my hand. It was not dry, it had been raining. I didn't try to rub it off; I didn't have heart enough to do that. I examined it closely with my eyes, and it looked red on that sill. I think I know red paint from blood. If you were to put some red paint on a sill, and put some blood there, I could tell three or four days afterwards whether it was paint or blood; I could tell it was human blood. If it was animal blood it would be just like any other blood. You could tell the difference between paint and blood, because the paint would not wash off, and the blood would. * * *

"The first time I knew the boy was killed was at the undertaker's. That man is Lewis Thompson; he is here as a witness now. Lewis Thompson told me that my boy was killed on the crossing, and after he told me that my wife and I went down there.

"I looked at that piece of flesh, and moved it with my foot, but I didn't touch it with my hand. I don't think a piece of raw beef would

have looked like that. In regard to whether I could tell whether that was a piece of human flesh, and whether I could tell human flesh three days old from a piece of beef, I will say that human flesh don't look like any beef. I have seen lots of human flesh cut off of a human being. I never examined when it was two or three days old, but I have seen lots of men killed and laid out in Cuba. * * *

"The place where we found that big piece of flesh was about half way between the crossing and the creosote plant, which was west of the crossing. According to what I saw after we went to Westheimer's I would say that piece of flesh was cut off of the knuckle of his heel; the skin was still on that piece of flesh, and it was black. The skin was puffed, like skinning anything from the hard part of his heel, and the other part of it at Westheimer's was in a bucket, and it was the skinny part of the foot and the hand."

Hannah Lavine, the mother, swore:

"After June 8, 1921, my husband and I went over there to that public crossing known as the Texas & New Orleans crossing. We found a piece of jumper there, and I knew whose piece of jumper it was. I knew that because I made the jumper, I knew the piece of goods. After finding that piece of jumper I walked a little piece further and there lay a piece of my child's flesh. That was a piece of meat, just a small piece of flesh. We found that just a little ways down from the crossing. By a little ways I mean about as far as from me to that table; I don't know whether that is about 15 feet. It was about four of your steps. We went on further, and there was a bigger piece of flesh. I didn't pick that up, but Joe turned it over with his foot."

Back and forth over the grilling reaches of a cross-examination, aided by scientific maps, measurements, and records as to time, place, and circumstances, these untutored witnesses were carried, without shaking the plain and simple story they thus told. Whose responsibility was it to judge as to its truth? The able trial judge told the jury, what this court has numberless times held must always be done, that it rested upon them, solemnly charging them:

"You are the exclusive judges of the facts proved, the credibility of the witnesses, and the weight to be given their testimony."

An outstanding feature of the testimony of this witness Lewis Thompson, who without contradiction said he was a mere passer-by and a stranger to the Lavines at the time of the accident, is that he stood there till the train passed and that the boy's body was not thrown to the ground at the crossing; the statements of Joe and Hannah Lavine that they found further down the track pieces of black flesh, parts of the jumper cloth the boy wore, and what they took to be splotches of human blood, cannot be said to be uncorroborative of this.

What is there now upon the opposing side that so compellingly confronts this simple

recital that a jury's right to appraise it must be denied? As I view this record, nothing in final sum except the statement of appellants' tower man that he first found the boy's body 2,200 feet down the track west of the crossing in the position and condition he testified to; except for this, there was, between the other witnesses, just an affirmance on one hand and a denial on the other that any accident occurred at the crossing—such a conflict only as the jury clearly had the right to resolve.

A brief analysis will make this plain; the tower man was alone when he first found the body, and no one of the remaining witnesses knew anything about where he found it except from his own statements to them; not only that, but irreconcilable discrepancy appears between his account and that of both the train operatives, the engineer and fireman, in that they swore that they were keeping a close lookout, and that no such accident occurred along there that night, whereas he testified that on his way from his home to the tower on that night he met the train they were running, Houston East & West Texas train 144, stepped off the track for it to go by, and "right after the train passed I got on the track back of the train, because it was not such rough walking, and after walking about a hundred yards, I found the body."

The engineer's positive assertion that he did not run over anybody at all that night is thus sworn to:

"On the night of June 8, 1921, between 9 and 10 o'clock I brought a string of cars from Englewood yards to Houston; I was engineer on train No. 144 that night. The engineer occupies the right side of the engine and the fireman the left. I know where Cushing street is. I did not run over anybody at the Cushing street crossing on that night. I did not run over anybody at all that night, and did not see anybody on the track. If there was anybody run over by my train I don't know it. I kept a careful lookout on the track that night as we left Englewood yards. There wasn't anybody struck by my engine that night. I first heard of the accident when I arrived in Houston the second day after the accident, which would be on the morning of the 10th."

The fireman testified on the point as follows:

"We did not strike anybody at that crossing on that night. I was looking out down the track and ringing the bell when we went over that crossing, and we were going about six miles an hour. So far as I know our train did not run over anybody that night. I first learned of the accident the next morning when we got to Timpson. They wired us and asked us to examine to see if there were any marks or blood on the engine, and told us that the boy had been found, and we did not find any marks on the engine that indicated that we had hit anything that night."

There is apparent confusion in another feature of the tower man's testimony; he states in one place that while the ambulance was coming he put the body on a push car and took it to the pump house, staying with it from the time he found it until the ambulance came, while it is otherwise shown that he left the body, went down the track for the watchman with his light, and that after going back to the body with him, they together again left it, going to the railway company's office at the creosote works to phone for an ambulance.

But detailed considerations aside, the jury here saw fit to discard the testimony of these three employees of appellants, in so far as it conflicted with that of appellees' witnesses above quoted from, and it seems to me they were justified in doing so; if the version of the two train operatives is to be accepted, the boy was not killed by Houston East & West Texas train 144 at all, while according to the tower man that train must have killed him and its long string of heavy freight cars passed over his body without actually severing a single member. Such a possibility is inconceivable.

It is quite true that the position, condition, and location of the body was not satisfactorily accounted for, but this seems to me to leave one of those inferences the jury might legitimately draw from the facts and circumstances that were in evidence; as appellants argue, it might have been run over where it was, while, as appellees suggest, it might either have been moved from the crossing or near it to the place where found after being run over, or more probably, as occurs to me, may have been first thrown upon the pilot and carried or dragged to where the watchman said he found it.

At any rate, sitting here in the quiet of these appellate chambers, far removed from the scene and from contact with the people who participated, with nothing but the pulseless written record of this trial to aid me, I cannot feel myself in equal position with the jury to pass upon these fact issues.

I think the motion for rehearing should have been granted, and the trial court's judgment affirmed.